[No. A108482. First Dist., Div. One. July 18, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JADE EMILY ANDERSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A.2., II.A.3., and II.A.4.

434

COUNSEL

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Morris Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MARGULIES, J.**—A jury convicted defendant of first degree murder based primarily on her videotaped interview with the police, during which she admitted that she ripped money from the pocket of the victim while her companion was strangling him to death. On appeal, defendant contends that her statement should been excluded because it was involuntary and taken in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). In addition, defendant contends that the trial court erred in failing to instruct sua sponte on lesser included offenses of murder and on theft. Although we affirm the trial court's admission of the videotape of the interview, we agree with defendant that the trial court had a sua sponte duty to instruct on lesser included offenses of murder. Because we find the trial court's failure to give such instructions to have been prejudicial, we reverse the conviction and remand for a new trial.

## I. BACKGROUND

Defendant, along with a codefendant, Mario Gonzales, was charged with one count of murder in an amended information filed May 12, 2004. (Pen. Code, § 187, subd. (a).) After the close of evidence at trial, the court allowed the prosecution to "add" a charge of felony murder by way of oral amendment.

On both October 12 and 13, 2001, maids at a San Leandro motel saw Barry Gonzales (victim),[1] a 49-year-old mason, lying on the floor of his motel room. They assumed he was sleeping. When one of the maids found him in the same position on October 14, the motel manager called the police. It was later determined that the victim had been strangled to death. His body was shirtless, and one pocket had been pulled through a tear in his pants. Defendant's fingerprint was on an envelope containing the victim's pay stub, found lying near his body beneath the bed sheet.

During the investigation, police learned that the victim's cell phone was missing. They obtained the records of the calls made using his cell phone and began interviewing the persons who had received those calls. One of those persons said that a caller had initially identified herself as "Susan" and then as "Jade."

Based on the fingerprint and phone use, police decided to interview defendant. What would turn out to be a 12-hour interview began shortly after

---

[1] There is no evidence that the victim was related to the codefendant, despite their shared surname.

1:00 p.m. on October 19, 2001. Unknown to defendant, the interview was recorded on both audiotape and videotape. The videotape constituted the primary evidence against her at trial.

At the outset of the interview, defendant was told that she was not under arrest and that if she became tired the police would give her a ride "where ever [she] wanted to go." Defendant, claiming to believe that she was under investigation only for use of the stolen cell phone, initially denied any knowledge of the victim or the crime. After over four hours of fruitless discussion, the interrogating detectives placed defendant under arrest for the victim's murder. They subsequently explained her rights under *Miranda*.

Over the next three to four hours of discussion, defendant, while wavering, maintained her denial. Eventually, however, defendant admitted that she was present when the victim was killed and described the events that night. She acknowledged that she knew the victim, although she was uncertain of his name, and had visited his room at the motel on at least three prior occasions, including the night before the homicide. During at least two of those visits, the victim had smoked crack.

She then explained what happened on the night of the homicide.[2] That night, defendant and Gonzales went to the victim's motel room after a day of drinking and smoking "crank." After they arrived, the victim asked Gonzales whether he could obtain crack cocaine. Defendant suggested that Gonzales find out whether a woman who lived upstairs in the same motel, referred to as "Brandi," had any crack cocaine to sell. Gonzales left the room. While defendant was alone with the victim, he offered to pay her to have sex with him. When she refused, he became angry and called her a "trick" and a "hooker." Eventually Gonzales returned to the room and sold the victim some crack cocaine. The victim took $5 from his wallet, paid Gonzales, put the crack cocaine in a pipe, and smoked it.

Soon after, the victim became angry. Although defendant initially said that the victim had resumed verbally abusing her over her refusal to have sex, she later admitted that he also accused Gonzales of selling him poor quality, or even fake, crack cocaine and that he was frustrated because Gonzales could not obtain additional crack. As tensions escalated, defendant and Gonzales stood to leave. At that point, the victim approached Gonzales angrily and

---

[2] What follows is a broad summary of defendant's confession. Over the course of the interview her story changed somewhat; she gave inconsistent accounts of some details and many of her comments were mumbled and barely audible or entirely inaudible. Our account is based both on a reading of a transcript of the interview audiotapes prepared by the police and a viewing of the three videotapes containing the interview. We were provided with only one of the 10 sequential audiotapes containing the interview.

ordered them out. Gonzales attempted to calm him, but the victim was "going ballistic." In defendant's words, "dude was ready. Dude wanted to fight." The victim swung a crack pipe he was holding at Gonzales's face, cutting it. As the two began fighting, Gonzales put the victim in a headlock. The victim struggled violently against Gonzales's restraint, kicking, swinging the crack pipe while attempting to stab Gonzales with it, and biting Gonzales forcefully on the bicep. As the pair struggled, defendant yelled at the victim to drop the crack pipe, tried unsuccessfully to pry it from his hand, cutting her own hand in the process, and attempted to pull on the victim as he swung the pipe at Gonzales. Eventually, the two men fell to the ground, with Gonzales maintaining his arm lock around the victim's neck. At some point, the victim stopped struggling and dropped the crack pipe.

While the victim and Gonzales were on the floor, Gonzales looked up at defendant, who was bleeding, and asked whether she was okay. Then Gonzales yelled at her to "[g]et the money" from the victim. As the combatants were lying on the floor, defendant attempted to reach into the pants pocket from which the victim had earlier taken his money. Finding his pants too tight, defendant grabbed an open knife lying nearby, which she claimed belonged to the victim, cut the pocket, and removed his money. By this time, the victim was no longer struggling, although Gonzales still held him. When Gonzales finally let go, the victim did not move or speak, although when defendant touched him she found that he was still breathing. Defendant insisted that she was not aware the victim had died until informed by police early in the interview. She claimed that when they left she was not sure whether the victim was actually hurt or merely faking it.

After Gonzales had let go of the victim, defendant picked up a pay envelope, examined it, and, when she found it empty, hid it under the mattress. As the pair was leaving the motel room, Gonzales took the victim's cell phone, which was in the dresser, and a black bag found to contain documents, and defendant unplugged the motel room telephone, fearing that the victim would recover and call the police. Defendant and Gonzales counted the money later, finding they had taken about $80.

Soon after the interview, police checked with "Brandi" (actually Randi), the woman defendant had mentioned during the interview. At trial, Randi testified that she was acquainted with defendant and that she had seen defendant at the motel between 5:00 and 6:00 p.m. on October 11, accompanied by a man she eventually identified as Gonzales. About 30 minutes after Randi had first seen defendant and Gonzales, Gonzales came to her room alone. He asked for a plastic bag and a bar of soap, both of which she gave to him, and he left. Randi, who was on probation for possession of methamphetamine for sale, testified that soap "was used as a substitute for drugs to sell

someone." While Gonzales was there, he commented to Randi that an unidentified person, referred to only as "he," had "a stack of 50s and 20s." Later, between 6:30 and 7:00 p.m., Gonzales returned to her room, asked to use the telephone to make a call within the motel, spoke on the phone for about a minute, and left again.

The pathologist who performed an autopsy on the victim testified that he died from asphyxia due to strangulation. Two "horns" of cartilage that supported his larynx had been fractured from compression against the bones of his spine, causing his larynx to collapse when he inhaled. The injury would have caused him very quickly to begin gasping for breath, but he would have retained the ability to move. Eventually he would have lost consciousness from lack of oxygen, and he would have died anywhere from 4 to 20 minutes after the injury occurred.

After viewing the entirety of the videotape of defendant's statement to police, as well as hearing the other evidence mentioned, the jury convicted defendant of first degree murder. She received a sentence of 25 years to life.

## II. DISCUSSION

### A. *Admission of the Interview Videotape*

· Defendant contends that the trial court was required to suppress her statement to the police because prior to the confessional portion of the interview, on separate occasions, she invoked her right to a lawyer and her right to silence.[3] She also contends that her statement was involuntary. Before considering the merits of defendant's arguments, we must determine the proper role of the findings included in a settled statement entered after trial, since defendant relies on those findings in making her arguments.

### 1. *The Settled Statement*

The videotape and audiotape of defendant's statement to police were at times indecipherable, both to police transcriptionists and to the trial judge. One of these partially inaudible moments came at a potentially critical time, during which defendant claims to have invoked her right to silence. The trial judge, after listening repeatedly to both the audiotape and videotape of this portion, concluded that the tapes could not be wholly deciphered and based his denial of defendant's motion to suppress her statement, in part, on this uncertainty.

---

[3] While we reverse defendant's conviction on instructional grounds, we nonetheless address the suppression of her confession because it is evidence that likely will be offered again in any retrial.

Several months after the trial, defendant's appellate counsel filed a "Request to Set Hearing on Motion for Settled Statement." In the request, counsel asked for a settled statement as to: (1) what portions of the videotape of defendant's interview were shown to the jury, information not ascertainable from the court reporter's notes because the court reporter was not asked to transcribe the videotape as it was playing for the jury; (2) the events on one court day when neither defendant nor her counsel were present and no reporter's transcription was made; and (3) the actual contents of the interview tapes at various significant points. The hearing on the request was not conducted by the trial judge, who had conducted the suppression hearing, but by a different superior court judge. The trial judge testified as a witness on the issue of the content of the interview tapes, describing his attempts to decipher the tapes and his conclusions in ruling on the suppression motion.

In the resulting settled statement, the judge who conducted the hearing made independent findings as to the content of the interview tapes. In contrast to the trial judge, who concluded that defendant's purported invocation of the right to silence was not clearly audible on the recordings of the interview, the second judge concluded that the transcript accurately reported defendant as saying on the audiotape, "Please don't talk to me." Defendant relies on this and other findings in the settled statement when discussing the contents of the interview tapes.

The partial record[4] before us does not disclose any objection by the prosecution to defendant's request for the settled statement proceedings, nor did the Attorney General challenge defendant's reliance on the settled statement in this court. Nonetheless, at oral argument we raised the issue of defendant's reliance on the settled statement procedure to clarify the content of the interview tapes, since we had never encountered the use of a settled statement for this purpose. Following argument, we requested briefing on the issue.

We assume that the prosecution waived any challenge to this procedure by failing to object. However, when "the issue is purely legal and presented to us on undisputed facts, and involves a matter of public interest, we retain discretion to decide it." (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 73 [115 Cal.Rptr.2d 3].) The proper use of the settled statement procedure in this context is solely a question of law. Further, the validity of any procedure that requires one superior court judge to testify about his factual findings before a second judge, who is then asked to

---

[4] The documents relating to the settled statement procedure were not a part of the original appellate record. In a supplement to the record, we were provided with defendant's request, the resulting order, and a transcript of the hearing. We have no way of knowing whether any other documents were generated in connection with the proceedings.

second-guess those findings, is a matter of public interest. We therefore exercise our discretion to consider the question.

█ Settled statements in criminal matters are governed by California Rules of Court, rule 32.3, which states that a settled statement can be requested when "a party learns that any portion of the oral proceedings cannot be transcribed." As the Supreme Court has explained, quoting a predecessor to rule 32.3, "as part of the preparation of the record of a criminal appeal, the appellant may apply to the trial court for settlement of a statement of any part of the 'oral proceedings' of which a transcript 'cannot be obtained for any reason.' " (*People v. Gzikowski* (1982) 32 Cal.3d 580, 584–585, fn. 2 [186 Cal.Rptr. 339, 651 P.2d 1145].) As this suggests, the purpose of a settled statement is to provide the appellate court with a record of trial court proceedings for which there is no formal contemporary record, commonly because the court reporter's notes have been lost (*People v. Bradford* (1997) 15 Cal.4th 1229, 1381 [65 Cal.Rptr.2d 145, 939 P.2d 259]) or because a court reporter was not present to record the proceedings. (E.g., *People v. Hawthorne* (1992) 4 Cal.4th 43, 61–62 [14 Cal.Rptr.2d 133, 841 P.2d 118].) In other words, the settled statement is used for filling "gaps in the [appellate] record." (*Marks v. Superior Court* (2002) 27 Cal.4th 176, 192 [115 Cal.Rptr.2d 674, 38 P.3d 512].) Consistent with this limited purpose, the settled statement is "intended to ensure that the record transmitted to the reviewing court preserves and conforms to the proceedings actually undertaken in the trial court," not to "allow parties to create proceedings, make records, or litigate issues which they neglected to pursue earlier." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 585 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; see also *People v. Griffin* (2004) 33 Cal.4th 536, 554, fn. 4 [15 Cal.Rptr.3d 743, 93 P.3d 344] ["A settled statement operates to make up for the absence of a reporter's transcript of oral proceedings [citations], and not to supply what was omitted from those proceedings"].)

Defendant's request to settle the record by determining which portions of the interview tapes were shown to the jury during the trial and what occurred in court on a day when defense counsel and defendant were absent from the courtroom was clearly proper. These events occurred in the courtroom in front of the jury, but there was no formal contemporary record of them. (*People v. Gzikowski, supra,* 32 Cal.3d at pp. 584–585, fn. 2.)

The same cannot be said for defendant's request to settle the record with respect to the contents of the video and audiotapes. The statements made to police during defendant's interview were not part of the "oral proceedings" of the court. Rather, the statements were made months earlier in police department headquarters. Defendant argues that the tapes became fair game for the settled statement procedure because they were "variously marked, introduced

into evidence, played at the *Miranda* hearing, played by the trial judge in his chambers and in his car, and played at trial." The fact that a tape of the police interview was introduced as evidence and played at trial, however, did not convert the interview itself into "oral proceedings" for purposes of rule 32.3 of the California Rules of Court. It remained a recording of oral events that transpired earlier, before the proceedings had begun.

 Restricting the settled statement procedure to the recreation of statements made or events occurring during the trial is consistent with its limited purpose, which is to "ensure that the record transmitted to the reviewing court preserves and conforms to the proceedings actually undertaken in the trial court." (*People v. Tuilaepa, supra,* 4 Cal.4th at p. 585.) Because the audiotapes and videotapes of the interview are available to us, we have a complete record of the evidence considered by the trial court at the suppression hearing. There is no "gap[] in the record" that must be filled by a settled statement. (*Marks v. Superior Court, supra,* 27 Cal.4th at p. 192.)

In support of her argument, defendant relies primarily on *People v. Lucas* (1995) 12 Cal.4th 415, 469 [48 Cal.Rptr.2d 525, 907 P.2d 373], in which the prosecution contended on appeal that the court reporter erroneously had inserted a word into the transcript of the court's jury instructions. The Supreme Court remanded for a hearing on a "motion to correct the record," during which it emerged that the extra word appeared in the court reporter's notes because the reporting software had transcribed a faint, inadvertent key stroke. (*Ibid.*) As this description makes plain, *Lucas* concerned things said during trial—the "oral proceedings"—rather than the content of prerecorded evidence introduced during those proceedings.

Instead of using the settled statement procedure to fill a gap in the appellate record, defendant is attempting to use the procedure to take a second bite at the trial court's factfinding during the suppression hearing. Dissatisfied with the conclusions of the original trial judge, defendant enlisted a second.[5] In so doing, defendant was using the settled statement procedure to "create proceedings, make records, or litigate issues which [defendant] neglected to pursue earlier," in contravention of *People v. Tuilaepa, supra,* 4 Cal.4th at page 585. Because we find defendant's use of the settled statement

---

[5] Defendant's claim that "[t]his settled statement did not challenge or contradict any factual finding made by [the trial judge]" is plainly wrong. The trial judge found the tapes to be indecipherable in part. By making findings as to the content of this portion of the tapes, the settled statement hearing judge not only found them decipherable but, in fact, purported to decipher them.

procedure inappropriate for this purpose, we will disregard the settled statement when discussing the content of the interview tapes.[6]

2.–4.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## B. *Failure to Instruct on Lesser Offenses*

Defendant contends that her conviction must be reversed because the trial judge, who instructed only on the crime of felony murder, had a sua sponte duty to instruct on the lesser included offenses of first degree murder—second degree murder and voluntary manslaughter—and on theft, which defendant characterizes as a lesser included offense of felony murder.

### 1. *The Duty to Instruct on Lesser Included Offenses*

■ "California law has long provided that even absent a request, and over any party's objection, a trial court must instruct a criminal jury on any lesser offense 'necessarily included' in the charged offense, if there is substantial evidence that only the lesser crime was committed. This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence." (*People v. Birks* (1998) 19 Cal.4th 108, 112 [77 Cal.Rptr.2d 848, 960 P.2d 1073] (*Birks*).) The sua sponte duty to instruct is designed to protect not only a defendant's " 'constitutional right to have the jury determine every material issue presented by the evidence' " but also " ' "the broader interest of safeguarding the jury's function of ascertaining the truth." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1215 [17 Cal.Rptr.3d 532, 95 P.3d 811].) The duty extends to every lesser included offense supported by substantial evidence; it is *not* satisfied "when the court instructs [solely] on the theory of that offense most consistent with the evidence and the line of defense pursued at trial." (*People v. Breverman* (1998) 19 Cal.4th 142, 153 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

■ A particular offense is considered a "lesser included offense," and therefore subject to the duty, if it satisfies one of two tests. The "elements" test is satisfied if the statutory elements of the greater offense include all the elements of the lesser, so that the greater cannot be committed without

---

[6] In her letter brief on this issue, defendant requests that we leave open to her the option of re-exploring the content of the tapes in the event of a retrial through, for example, the use of electronic enhancement. We decline to make any advisory ruling on the extent to which the trial court's findings regarding the content of the tapes are binding in the event of a retrial.

[*]See footnote, *ante*, page 430.

committing the lesser; the "accusatory pleading" test is satisfied if the facts actually alleged in the accusatory pleading include all the elements of the lesser offense, such that the greater offense charged cannot be committed without committing the lesser offense. (*People v. Cook* (2001) 91 Cal.App.4th 910, 918 [111 Cal.Rptr.2d 204].) The scope of the sua sponte duty to instruct is determined from the charges and facts alleged in the accusatory pleading: "[T]he rule ensures that the jury will be exposed to the full range of verdict options which, by operation of law and with full notice to both parties, are presented in *the accusatory pleading itself* and are thus closely and openly connected to the case. In this context, the rule prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' [Citations.]" (*Birks, supra,* 19 Cal.4th at p. 119.)

### 2. *Second Degree Murder and Manslaughter*

Defendant contends that the trial court had a sua sponte duty to instruct on the crimes of second degree murder and manslaughter. The trial judge himself initially indicated that he would instruct on the lesser included offense of voluntary manslaughter. At the hearing to settle jury instructions, the prosecution objected to the court's proposal to deliver an instruction on voluntary manslaughter premised on imperfect self-defense on the ground it was not supported by substantial evidence. The court rejected the argument, noting, "I will give voluntary manslaughter as a lesser offense should they find [defendant] not guilty of the first degree murder." Prior to summoning the jury on the next morning, however, the trial judge reversed himself. On the basis of *People v. Balderas* (1985) 41 Cal.3d 144 [222 Cal.Rptr. 184, 711 P.2d 480] (*Balderas*), the trial judge announced his intention to withdraw the imperfect self-defense manslaughter instruction. Following a lengthy defense objection, the court affirmed this decision.

█ It is well established that the crimes of second degree murder and voluntary manslaughter are lesser included offenses of first degree murder. (*People v. Seaton* (2001) 26 Cal.4th 598, 672 [110 Cal.Rptr.2d 441, 28 P.3d 175] [second degree murder]; *People v. Randle* (2005) 35 Cal.4th 987, 994 [28 Cal.Rptr.3d 725, 111 P.3d 987] [manslaughter].) Second degree murder is "an unpremeditated killing with malice aforethought." (*People v. Seaton,* at p. 672.) Voluntary manslaughter is an intentional, unlawful killing committed without malice aforethought. (*People v. Rios* (2000) 23 Cal.4th 450, 458 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) The two most commonly recognized grounds for voluntary manslaughter are (1) " ' " 'sudden quarrel or heat of passion' " ' " and (2) the " ' "unreasonable but good faith belief in having to act in

self-defense." ' " (*Id.* at p. 460.) Imperfect defense of another person is also a basis for voluntary manslaughter. (*People v. Randle*, at p. 997.)

We first address the argument found persuasive by the trial court, repeated on appeal by the prosecution, that there was no sua sponte duty to instruct on second degree murder and voluntary manslaughter because, under *Balderas,* these offenses are not lesser included offenses of felony murder.[13] Defendant argues that, regardless of the status of these crimes as lesser included offenses of felony murder, the court had a constitutional duty to instruct on second degree murder and involuntary manslaughter because the jury was otherwise presented with an unjustified all-or-nothing choice between the stated crime and acquittal. As noted in *People v. Barton* (1995) 12 Cal.4th 186, 196 [47 Cal.Rptr.2d 569, 906 P.2d 531]: "Truth may lie neither with the defendant's protestations of innocence nor with the prosecution's assertion that the defendant is guilty of the offense charged, but at a point between these two extremes: the evidence may show that the defendant is guilty of some intermediate offense included within, but lesser than, the crime charged. A trial court's failure to inform the jury of its option to find the defendant guilty of the lesser offense would impair the jury's truth-ascertainment function. Consequently, neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged. To permit this would force the jury to make an 'all or nothing' choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence." The United States Supreme Court has suggested that this situation could "raise difficult constitutional questions." (*Keeble v. United States* (1973) 412 U.S. 205, 213 [36 L.Ed.2d 844, 93 S.Ct. 1993]; see also *Beck v. Alabama* (1980) 447 U.S. 625, 637–638 [65 L.Ed.2d 392, 100 S.Ct. 2382] [instruction required in capital case].)

We find it unnecessary to resolve this question here. We assume for the sake of argument that, as the prosecution argues, the trial court would have had no sua sponte duty to instruct if felony murder were the only crime charged because second degree murder and voluntary manslaughter are not lesser included offenses of felony murder. (See *People v. Cavitt* (2004) 33 Cal.4th 187, 197 [14 Cal.Rptr.3d 281, 91 P.3d 222]; *Balderas, supra,* 41 Cal.3d at p. 198.) In this case, however, felony murder was not the crime charged, at least in the accusatory pleading. The first amended information

---

[13] *Balderas* itself is readily distinguishable, since its actual holding is that an instruction on voluntary manslaughter is inappropriate when the "heat of passion" claimed by the defendant was incited by the resistance of the victim to the defendant's robbery. (*Balderas, supra,* 41 Cal.3d at pp. 196–197.) No such argument was made in this case, in which substantial evidence existed to support a claim of sudden quarrel unconnected to the eventual theft.

contained only a single charge of murder under Penal Code section 187: "The District Attorney . . . hereby accuses [Gonzales and defendant] of a Felony, to wit: MURDER, a violation of section 187[, subdivision] (a) of the PENAL CODE of California, in that between October 11, 2001 and October 12, 2001 . . . said defendant(s) did unlawfully, and with malice aforethought, murder BARRY GONZALES, a human being." A predicate felony to support felony murder was charged only against Gonzales, not defendant, as a special circumstance. The charge of felony murder against defendant was "added" to the information by oral amendment only after the close of evidence at trial.

█ It has been held consistently that the scope of the sua sponte duty to instruct is determined by the charge contained "in *the accusatory pleading itself.*" (*Birks, supra,* 19 Cal.4th at p. 119; see, e.g., *People v. Moon* (2005) 37 Cal.4th 1, 26 [32 Cal.Rptr.3d 894, 117 P.3d 591] [describing the "accusatory pleading" test].) This is so because the role of the accusatory pleading is to provide notice to the defendant of the charges that he or she can anticipate being proved at trial. "When an accusatory pleading alleges a particular offense, it thereby demonstrates the prosecution's intent to prove all the elements of any lesser necessarily included offense. Hence, the stated charge notifies the defendant, for due process purposes, that he must also be prepared to defend against any lesser offense necessarily included therein, even if the lesser offense is not expressly set forth in the indictment or information." (*Birks,* at p. 118.) "Because a defendant is entitled to notice of the charges, it makes sense to look to the accusatory pleading (as well as the elements of the crimes) in deciding whether a defendant had adequate notice of an uncharged lesser offense so as to permit conviction of that uncharged offense." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1039 [16 Cal.Rptr.3d 902, 94 P.3d 1098] (conc. opn. of Chin, J.).) Because second degree murder and voluntary manslaughter are lesser included offenses of the offense charged against defendant in the amended information, defendant was on notice that she might be convicted of that crime or any of its lesser included offenses—and, by the same token, that she could anticipate instructions on these lesser offenses if they were supported by substantial evidence.

█ While we realize that, technically, the prosecution amended the information after the close of evidence to include a charge of felony murder, we conclude that this amendment should not be permitted to alter the expectations created by the original information. It is not clear from the transcript that the felony-murder charge supplanted the murder charge contained in the information, since the trial court referred to felony murder as an "added" charge. If the original charge of murder remained, the sua sponte duty to instruct as to lesser offenses did as well. Even if felony murder had been intended to replace the existing charge, an amendment made at the close of evidence does not satisfy the notice function that underpins the duty of sua

sponte instruction. (E.g., *Birks, supra,* 19 Cal.4th at p. 118.) Having established the expectation that instruction on lesser included offenses of murder would be given, if supported by the evidence, the prosecution could not defeat that expectation by amendment after the close of evidence.

■ That does not resolve the issue raised by defendant. As noted, for the court's sua sponte duty to arise there must have been substantial evidence to support a finding that the events did not constitute a felony murder. (See *People v. Benavides* (2005) 35 Cal.4th 69, 102 [24 Cal.Rptr.3d 507, 105 P.3d 1099] [the sua sponte duty arises if there is "substantial evidence raising a question as to whether all of the elements of the charged offense are present"]; *People v. Mendoza* (2000) 23 Cal.4th 896, 908 [98 Cal.Rptr.2d 431, 4 P.3d 265] [court can withdraw from jury issue of degree of murder if the killing was "indisputably" committed in the course of an enumerated felony].) " ' " 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " ' " (*People v. Benavides,* at p. 102.) A felony murder arises when a killing occurs in the course of the commission of one of the predicate felonies enumerated in Penal Code section 189. (*People v. Cavitt, supra,* 33 Cal.4th at p. 197.) A killing occurs "during the commission" of the predicate felony, however, only if the intent to commit the predicate felony exists at the time of the killing. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1249–1250 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Moreover, the existence of this intent must be measured individually for each participant in the predicate felony; if a particular defendant formed the intent to commit the felony only after the killing occurred, that defendant is not guilty of felony murder. (E.g., *People v. Pulido* (1997) 15 Cal.4th 713, 723–724 [63 Cal.Rptr.2d 625, 936 P.2d 1235].)

■ Defendant stated that she cut the money from the victim's pants only in response to Gonzales's exhortations. At the time he instructed her to take the money, the victim was lying on the ground, no longer struggling. Although defendant noted that the victim was not dead at this point, the existence of her intent is not measured at the time of the victim's death but at the time of the acts that caused the death. (See *People v. Lewis* (2001) 25 Cal.4th 610, 647 [106 Cal.Rptr.2d 629, 22 P.3d 392] [prosecution must establish that the defendant intended to commit the predicate felony " 'either prior to or during the commission of the acts which resulted in the victim's death' "; if "the killer forms the intent to commit an independent felony only after delivering the fatal blow to the victim, the felony-murder doctrine does not apply"]; *People v. Green* (1980) 27 Cal.3d 1, 54, fn. 44 [164 Cal.Rptr. 1, 609 P.2d 468] [no felony murder if intent to commit felony "arose after the infliction of the fatal wound"], overruled on other grounds in *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99] & *People v. Martinez* (1999) 20 Cal.4th 225, 239 [83 Cal.Rptr.2d 533, 973 P.2d 512]; *People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1396 [34 Cal.Rptr.2d 324]

[no felony murder if design to take property formed "after the victim had already been killed or mortally wounded"].) The pathologist testified that the victim would have retained the ability to move even after his larynx had been crushed, although he would have begun gasping for breath, and that he could have lived from 4 to 20 minutes after the fatal wound was inflicted. Defendant's description of the chain of events, combined with the pathologist's testimony, constituted substantial evidence to support a conclusion that defendant did not decide to take the victim's money until he had been mortally wounded. If the victim had already received the fatal blow when defendant first formed the intent to take his money, her participation in the killing was not a felony murder.

Second, there was substantial evidence supporting a finding that defendant was nonetheless a participant in the homicide. Although she did not apply the fatal blow to the victim, she told the police that she assisted Gonzales during the struggle by attempting to restrain the victim and take the broken crack pipe from his hand. Defendant concedes that these acts would have supported a finding that she was an aider or abettor of the killing.

Finally, there was substantial evidence to support a finding that the homicide, if not a felony murder, was either second degree murder or voluntary manslaughter, the latter motivated by a sudden quarrel or imperfect self-defense. Defendant told the police that Gonzales was in the process of leaving the apartment when the victim began acting aggressively. According to her statement, Gonzales did not assume his chokehold on the victim until after the victim had cut his face with a crack pipe. Because, under this version of events, the killing was not premeditated, a lesser offense than first degree murder was supported.[14] Further, defendant's statement provided substantial evidence supporting a conclusion that Gonzales's fatal chokehold was motivated by rage at the victim's unprovoked attack—a sudden quarrel or heat of passion—or that he acted in the good faith but unreasonable belief that his actions were necessary to protect himself or defendant from imminent danger of death or great bodily injury—imperfect self-defense or defense of others. Either conclusion would result in a finding of voluntary manslaughter, rather than murder. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 583 [36 Cal.Rptr.3d 340, 123 P.3d 614] [quarrel]; *People v. Randle, supra,* 35 Cal.4th at p. 994 [imperfect self-defense].)

The prosecution argues that, "[f]or decades, California law has consistently held that when a homicide is committed in the course of a felony

---

[14] While Gonzales's comment to Randi regarding the victim's cash provided some evidence of an intent to rob, it was only slight, if any, evidence of a premeditated intent to murder. The testimony was therefore not so compelling that it required rejection of defendant's version of the events.

listed in Penal Code section 189, the trial judge may instruct the jury that the defendant is guilty of first degree murder or nothing, and may properly decline to give instructions on second degree murder and manslaughter," citing such cases as *People v. Valdez* (2004) 32 Cal.4th 73, 116 [8 Cal.Rptr.3d 271, 82 P.3d 296] (*Valdez*), and *People v. Turner* (1984) 37 Cal.3d 302, 327 [208 Cal.Rptr. 196, 690 P.2d 669] (*Turner*), overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115 [240 Cal.Rptr. 585, 742 P.2d 1306]. Neither those cases, nor any other, announce such a broad rule. *Valdez* is simply irrelevant, since the court found no duty to instruct on the lesser included offenses because there was no substantial evidence to support them. (*Valdez*, at p. 116.) *Turner* states the correct rule: "When the evidence points *indisputedly* to a homicide committed in the course of a felony listed in section 189 of the Penal Code, the court is justified in advising the jury that the defendant is either innocent or guilty of first degree murder." (*Turner*, at p. 327, italics added; see similarly, *People v. Mendoza, supra,* 23 Cal.4th at pp. 908–909; *People v. Rupp* (1953) 41 Cal.2d 371, 382 [260 P.2d 1] [issue of the degree of a murder can be taken from the jury only if the evidence "points indisputably" to a felony murder].) As discussed above, the evidence here does not "indisputably" indicate a felony murder, since substantial evidence supported a finding that defendant formed an intent to take the victim's money only after Gonzales had fatally crushed his larynx.

### 3. *Theft*

Defendant also contends that the trial judge had a sua sponte duty to instruct on the crime of theft. This issue was not raised at trial, although defense counsel did request instructions and a verdict form that would permit the jury to find defendant guilty only of robbery on the grounds that "[t]he specific intent to deprive in connection with robbery has to be formed prior to the application of force . . . and . . . that the intent to steal was formed after the application of force." The trial court rejected the requested verdict form, correctly noting that "if they find a robbery, they have to find her on a first degree murder" because a conviction on the crime of robbery requires the use of force simultaneous with an intent to steal. Eventually agreeing with this point, defense counsel withdrew the request without asking for a separate instruction on theft.

As defendant points out, the crime of theft is different from robbery. If defendant did not form the intent to steal until after Gonzales applied the fatal force, she would be guilty of theft in taking the victim's money, but not of either robbery or murder. (See, e.g., *People v. Silva* (2001) 25 Cal.4th 345, 371 [106 Cal.Rptr.2d 93, 21 P.3d 769] (*Silva*).) The Supreme Court, however, has repeatedly rejected the argument that the trial court has a sua sponte duty to instruct on theft as a lesser included offense of felony murder when

robbery is not separately charged, even when the charge of theft finds substantial evidentiary support. In reaching that conclusion, the court has reasoned that theft is not a lesser included offense of felony murder. Therefore, if robbery is not separately charged, but is "relevant only as [a] predicate offense[] under the felony-murder doctrine," theft is a lesser included offense merely of an uncharged crime, for which there is no sua sponte duty to instruct. (*Silva*, at p. 371; see also, *Valdez, supra,* 32 Cal.4th at pp. 110–111; *People v. Cash* (2002) 28 Cal.4th 703, 736 [122 Cal.Rptr.2d 545, 50 P.3d 332].)

Defendant acknowledges these cases but distinguishes them as involving charges against the "actual killer," rather than a nonkilling accomplice, such as defendant. While it is true that each of the cited cases involved a prosecution against the killer, the Supreme Court did not cite that fact in rejecting a sua sponte duty to instruct on theft, nor did that distinction figure in the court's rationale. Regardless of whether the prosecution is brought against a killer or a nonkiller, theft is not a lesser included offense of a charged crime in a felony-murder prosecution unless robbery is separately charged in the accusatory pleading. Under the analysis of the three cases cited above, there is therefore no sua sponte duty to instruct with regard to it. Although defendant argues that these cases "did not overrule the line of authority . . . which require[s] *sua sponte* instruction on theft, at least for an aider and abettor," there is no authority requiring a sua sponte instruction on theft where felony murder, but not robbery, is charged, whether for a principal or an aider and abettor.

While defendant argues that the absence of a theft instruction could leave the jury with an all-or-nothing choice between felony murder and acquittal, the Supreme Court has rejected that argument as grounds for establishing a sua sponte duty to instruct. In *Valdez,* the defendant "attempt[ed] to distin-guish *Silva* on the ground that the jury in *Silva* was instructed on felony murder, robbery murder, and first degree premeditated and deliberate murder, while in his case, the jury was instructed only on felony murder." (*Valdez, supra,* 32 Cal.4th at p. 111.) The court found "[t]his distinction . . . of little or no significance." (*Ibid.*) Defendant's constitutional arguments have been rejected as well. (*People v. Cash, supra,* 28 Cal.4th at p. 738.) In the absence of a charge of robbery, the trial court had no sua sponte duty to instruct on theft.

*4. Prejudice*

While we find no sua sponte duty to instruct on theft, it was error for the trial court not to have instructed on second degree murder and voluntary manslaughter. In *People v. Breverman, supra,* 19 Cal.4th at page

176, our Supreme Court determined that such an error does not justify reversal of a conviction unless the error was prejudicial under the familiar *Watson* standard, which precludes reversal unless it is "there was a reasonable probability the error affected the outcome." (*People v. Breverman*, at p. 149, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In applying this test, we are instructed to "focus[] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman*, at p. 177.)

Applying the *Watson* test, we conclude that a different result was reasonably probable had the required instructions been given. The evidence supporting a finding that defendant had formed the intent to steal in advance of the victim's killing, thereby creating a felony murder, was not overwhelming. In her statement, defendant told the police that she acted only in response to Gonzales' prompting, while the victim lay unresisting, presumably from lack of oxygen due to a crushed larynx. Aside from the general circumstances, the primary evidence suggesting that defendant had an intent to steal prior to this time was Gonzales's comment to the neighbor, Randi, that the victim had "a stack of 50s and 20s," which supported an inference that Gonzales, at least, was planning to rob the victim. There were grounds for doubting the truth of this testimony, since the victim did not, in fact, possess a "stack" of bills, and Randi, on probation for possession of drugs for sale, suggested that her testimony had been coerced by the police.[15] On the other hand, there was strong evidence that an unlawful killing occurred and that defendant aided and abetted that killing. By failing to give an instruction on the lesser included offenses of murder, the trial judge prevented the jury from considering whether a type of homicide other than felony murder best fit the evidence adduced at trial. Because the evidence supporting a homicide other than felony murder was "*relatively* strong" (*People v. Breverman, supra,* 19 Cal.4th at p. 177), we conclude it is reasonably probable that a properly instructed jury would have found defendant guilty of a crime other than felony murder.

Defendant's conviction must be reversed for instructional error. Because we reverse, we do not address the remaining arguments raised by defendant.

---

[15] Randi testified that the police had threatened to remove her children if she did not cooperate with them. As a result, she told the police "whatever needed to be said to keep them from taking [her] kids."

## III. DISPOSITION

Defendant's conviction is reversed. The matter is remanded for a new trial.

Stein, Acting P. J., and Swager, J., concurred.