Filed 8/29/14  P. v. Lopez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B248168 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA096127) |
| v. | |
| TOMAS LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George Genesta, Judge.  Affirmed with directions.

Dan Mrotek, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

A jury convicted appellant Tomas Lopez of first degree murder under a felony-murder theory. Appellant asserts two instructional errors and contends the court imposed two unauthorized fines. We agree with respect to the fines but otherwise affirm.

## FACTS

The victim in this case was Tony Vien.[1] On March 8, 2004, Tony lived in El Monte with his brother Kevin, his sister Kacey, and their parents. Around 8:00 or 9:00 p.m. that day, the family had just finished having dinner. Kacey was in her room, Tony and his father were watching television in the living room, his mother was in the kitchen, and Kevin was out with his girlfriend, Sabrina Tan. Tan met Kevin at the Viens' house and parked her Acura Integra nearby when they went out. A month or so before March 8, when Tan's car was parked in the same spot near their house, someone had broken into her car and stolen the stereo. She installed a car alarm after that incident.

Tony was a smoker and would normally go outside to the front yard to smoke because he was not allowed to smoke in the house. Tony knew Tan's car had recently been broken into. He was the type of person who would do something if he knew someone was breaking into her car again.

At some point, Kacey heard her mother screaming and ran to the front door. She found Tony laying in the front entrance and bleeding profusely from the area around his heart. Kacey called 911. At approximately 9:00 p.m., Kevin received a voicemail notifying him that something had happened back at his house. He and Tan rushed to his house but were unable to get there because officers had the street blocked off.

The medical examiner from the coroner's office determined Tony suffered one fatal stab wound to the right ventricle of the heart, another fatal stab wound to the right lung, and a third stab wound on his right arm around his elbow. Tony did not have any wounds consistent with defense wounds.

---

[1] For the sake of clarity, we will refer to the various members of the Vien family by their first names. We mean no disrespect with this informality.

Officer Michael Paredes responded to the Viens' house at approximately 9:47 p.m. on March 8, 2004. He found Tan's Acura had been broken into. On the street near the car, the officer found a car stereo, a pair of black rubber sandals, a pair of black corduroy slippers, and a beer bottle. A forensic specialist preserved these items in a secure bag for later analysis. The following morning, a neighbor down the street from the Viens' house found a knife in his front yard. The knife was also collected and preserved for evidence. The forensic specialist lifted four latent fingerprints from the inside of the driver's door of the Acura and one latent fingerprint from the outside of the driver's door.

Appellant was implicated in the stabbing death of Tony years after the incident. On September 15, 2011, Detective Manuel Avina of the Los Angeles County Sheriff's Department was working undercover with two other deputies in this case. Appellant was in custody for something unrelated to Tony's killing. Detective Avina and the deputies were placed in a jail cell with appellant and directed to talk with him as if they were also inmates to see whether he would make any statements about the auto burglary and stabbing death of Tony. Detective Avina was wearing a recording device, and Sergeant Jeff Cochran was listening through a live feed. The officers initially talked with appellant about other things like "the bad food [and] dumb deputies" to attempt to establish a rapport with appellant. At some point, the officers turned the conversation to why they had all been brought to the cell. They suggested they had all been brought there for DNA testing and possible additional charges.

Appellant referred to an incident that had happened seven years earlier. He told them he had been stealing a radio from a car when "a person had run up on him" and said something like, "Hey. What are you doing?" Appellant was inside the car when he saw the man running toward him "full speed." He stood up next to the vehicle, dropped the car radio, ran up to the man, and stabbed the man in the chest one to three times with a knife appellant had in his pocket. At one point, appellant chased the man. After the stabbing, appellant ran away. Appellant remembered leaving at least one shoe behind, a type of slipper. He tossed the knife he used in a yard nearby. He learned the stabbing victim's name and age later from the news and newspapers. He got several tattoos after

3

the stabbing relating to the incident. He had a tattoo of a smiling person with 20 teeth showing to signify his age when the incident occurred. Near that tattoo, he also had a tattoo of a knife he said resembled the knife he used during the incident. Additionally, he had a tear drop tattooed on his face as a memory of the incident.

The officers suggested to appellant he should try to use self-defense "as a way of trying to beat the case." They thought this would be a normal thing for one inmate to say to another, and they also suggested it because they wanted to keep him talking about the incident. Appellant said he did not know if the man he stabbed had any weapons on him, and the man never touched appellant. The officers were in the cell with appellant for approximately two hours, during which time they talked about the stabbing intermittently.

Appellant was taken from the cell to Sergeant Cochran, who read appellant his *Miranda*[2] rights and recorded an interview with appellant. Appellant told the sergeant that, on the night of March 8, 2004, he had used a knife to break into a grey Acura, and while he was stealing the car radio, the car's alarm went off. He saw a person running directly at him "quickly" from a house near the car. Appellant said he stabbed this person two to three times in the chest. He then left the radio and ran from the location, leaving behind his slippers. Appellant told the sergeant he did not conspire to murder anyone and mentioned self-defense several times. He also said "he just panicked." But appellant said he was not injured and the victim had no weapons on him.

Tony's DNA profile matched blood found on the corduroy slippers and the knife. Investigators also took DNA swabs from the beer bottle found at the scene and the inside of the slippers. Appellant's DNA profile matched the DNA on the beer bottle and the inside of the slippers; the chance that someone other than appellant contributed the DNA was one in 79 quintillion. Appellant's fingerprints matched the latent fingerprints lifted from the Acura.

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

4

## PROCEDURAL HISTORY

The amended information charged appellant with murder (Pen. Code, § 187)[3] and alleged he committed the offense while engaged in a felony, specifically auto burglary (§ 459). (§ 190.2, subd. (a)(17)(G).) It further alleged appellant used a deadly and dangerous weapon (a knife) during the commission of the offense. (§ 12022, subd. (b)(1).) The jury found appellant guilty of first degree murder and found the allegations to be true. The court denied probation and sentenced appellant to state prison for life without the possibility of parole, plus one consecutive year for the weapon enhancement. Appellant filed a timely notice of appeal.

## STANDARD OF REVIEW

Asserted instructional errors are questions of law we review de novo. (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.)

## DISCUSSION

### 1. *No Logical Nexus Instruction Required*

Appellant contends the trial court committed prejudicial error by failing to instruct sua sponte on the "logical nexus element" of felony murder. We disagree.

Under the felony-murder rule, a killing "committed in the perpetration of, or attempt to perpetrate," a burglary is first degree murder. (§ 189; see *People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).) The statutory phrase that the killing be "committed in the perpetration of" the felony does not require "a strict causal or temporal relationship between the felony and the murder . . . ; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction." (*People v. Young* (2005) 34 Cal.4th 1149, 1175; see *People v. Chavez* (1951) 37 Cal.2d 656, 669 ["The law of this state has never required proof of a strict causal relationship between the felony and the homicide."].) Moreover, the felony-murder rule holds the defendant strictly responsible for a killing committed during certain enumerated felonies, regardless

---

[3]     Further undesignated statutory references are to the Penal Code.

of whether the killing was intentional, negligent, or accidental. (*People v. Washington* (1965) 62 Cal.2d 777, 781.) The defendant need only have the specific intent to commit the underlying felony. (*Cavitt, supra*, at p. 197.) Thus, "first degree felony murder encompasses a far wider range of individual culpability than deliberate and premeditated murder. It includes not only the latter, but also a variety of unintended homicides . . . ; it embraces both calculated conduct and acts committed in panic or rage, or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable." (*People v. Dillon* (1983) 34 Cal.3d 441, 477.)

In accordance with these principles, the court instructed the jury on the required elements of first degree felony murder (CALCRIM No. 540A) and the definition of the "one continuous transaction" requirement (CALCRIM former No. 549). Specifically, the court instructed the jury that, under a felony-murder theory, the People had to prove "the auto burglary and the act causing the death were part of one continuous transaction," and it set forth seven factors the jury could consider.[4]

Appellant argues this was insufficient and the court also had to instruct the jury on the requirement of a logical nexus between the felony and the act causing death. Appellant is wrong. The logical nexus requirement applies to felony-murder cases when a coparticipant in the felony, *not the defendant*, has allegedly committed the fatal act. (*People v. Huynh* (2012) 212 Cal.App.4th 285, 310.) In a single perpetrator case such as

---

[4] These seven factors were "1. Whether the felony and the fatal act occurred at the same place; [¶] 2. The time period, if any, between the felony and the fatal act; [¶] 3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony; [¶] 4. Whether the fatal act occurred after the felony but while the perpetrator continued to exercise control over the person who was the target of the felony; [¶] 5. Whether the fatal act occurred while the perpetrator was fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime; [¶] 6. Whether the felony was the direct cause of the death; [¶] AND [¶] 7. Whether the death was the natural and probable consequence of the felony."

this, the one continuous transaction requirement, and not the logical nexus requirement, is appropriate. (*Id.* at pp. 310-311.)

To support his assertion that the logical nexus requirement applies to single perpetrator cases, appellant relies on *Cavitt* and *People v. Wilkins* (2013) 56 Cal.4th 333 (*Wilkins*). Neither support his assertion. In *Cavitt*, the California Supreme Court "granted review to clarify a nonkiller's liability for a killing 'committed in the perpetration' of an inherently dangerous felony" under the felony-murder rule. (*Cavitt, supra*, 33 Cal.4th at p. 193.) It held "*in such circumstances*, the felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death. The causal relationship is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit. The temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction." (*Ibid.*, first italics added.) Thus, *Cavitt*'s holding that a logical nexus is required is expressly limited to nonkillers' liability for felony murder. (*Ibid.*; see also *id.* at p. 201 ["[F]or a nonkiller to be responsible for a homicide committed by a cofelon under the felony-murder rule, there must be a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in death."].) Indeed, the *Cavitt* court advised, "[W]e are not concerned with that part of the felony-murder rule making a *killer* liable for first degree murder if the homicide is committed in the perpetration of a robbery or burglary. Rather, the question here involves "'a *nonkiller's* liability for the felony murder committed by another.'" (*Id.* at p. 196.)

Appellant recognizes the limitations of *Cavitt*'s holding but argues dicta in *Wilkins* extends the logical nexus requirement to single perpetrator cases. Appellant misreads *Wilkins*. *Wilkins* does not extend the logical nexus requirement, not even in dicta. *Wilkins* was a single perpetrator case regarding whether the trial court erred in refusing to instruct the jury on the so-called "'escape rule.'" (*Wilkins, supra*, 56 Cal.4th at p. 338.) While discussing *Cavitt*, the court noted the different context in which it decided that

7

case -- namely, that *Cavitt* "addressed the scope of accomplice liability" or """"a *nonkiller's* liability"""" under the felony-murder rule. (*Wilkins, supra*, at p. 342.)

In the course of rejecting an argument made by the respondent, the *Wilkins* court further stated: "Our opinion in *Cavitt* made clear, however, that 'the felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death.' [Citation.] The causal relationship is established by a 'logical nexus' between the felony and the homicidal act, and '[t]he temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction.' [Citation.] Although, as discussed above, *Cavitt* addressed an accomplice's liability under the felony-murder rule, respondent provides no rationale or authority for eliminating the required 'temporal relationship' in cases involving the liability of a sole perpetrator." (*Wilkins, supra*, 56 Cal.4th at pp. 346-347.) According to appellant, this is *Wilkins* saying both the logical nexus and one continuous transaction requirements apply to single perpetrator cases. But the only thing the court says here about single perpetrator cases is that a "'temporal relationship'" must exist between the felony and homicidal act, and the prosecution may establish a temporal relationship with proof that the two were part of one continuous transaction. *Wilkins* simply reaffirms the well-established requirement of one continuous transaction in single perpetrator cases. The court had no sua sponte duty to instruct on the logical nexus requirement in this single perpetrator case.

## 2. *No Second Degree Murder Instruction Required*

Appellant contends the court prejudicially erred when it failed to instruct sua sponte on the lesser included offense of second degree murder. We also reject this contention.

As we have discussed, when the prosecution establishes a defendant killed while committing one of certain enumerated felonies, the killing is deemed first degree murder as a matter of law. There are no other degrees of such murders. (*People v. Mendoza* (2000) 23 Cal.4th 896, 908.) That felony murder "can only be of the first degree has several significant consequences at trial." (*Ibid.*) When the facts point indisputably to

8

felony murder, the defendant can be guilty of only felony murder, and the court need not instruct the jury on other offenses or on the differences between the degrees of murder. (*Id*. at p. 909.) Put another way, for the court to have a sua sponte duty to instruct on offenses other than felony murder, there must be substantial evidence to support a finding that the facts did *not* constitute felony murder. (*People v. Anderson* (2006) 141 Cal.App.4th 430, 446.) When the evidence indisputably establishes a killing committed in the perpetration of an enumerated felony, withdrawing the question of degree from the jury does not violate the constitutional right to have a jury determine every material issue. (*People v. Mendoza, supra*, at p. 909.)

The evidence here indisputably established a killing committed in the perpetration of an auto burglary. Appellant's own statements demonstrated he was stealing the radio from Tan's car when Tony caught him in the act. Appellant saw Tony running toward him and heard Tony say something along the lines of "Hey, what are you doing?" Appellant got out of the car and dropped the radio, ran at Tony and stabbed him two to three times, then escaped the scene. The felony and the fatal act were unquestionably parts of one continuous transaction, and appellant does not argue otherwise. Instead, appellant argues there was substantial evidence he did not commit felony murder because there was evidence no "logical nexus" existed between the felony and fatal act. He suggests the jury could have reasonably inferred he stabbed Tony "as a malicious response to [Tony's] aggression" or the "personal 'disrespect'" Tony showed by challenging him. In this light, he argues, his motive for stabbing Tony could have been completely unrelated to the underlying burglary. Even if the jury believed appellant stabbed Tony solely as a response to some disrespect or aggression shown by Tony, we disagree that this constituted substantial evidence of no logical nexus between the felony and fatal act. But more importantly, as we explained in the foregoing part, the prosecution was not required to prove a logical nexus in this single perpetrator case. The evidence indisputably established one continuous transaction and felony murder as a matter of law. The court, therefore, had no duty to instruct on a lesser degree of murder. (*People v. Mendoza, supra*, 23 Cal.4th at p. 909.)

9

### 3. *The Section 1202.5 and 1202.45 Fine Orders Were Unauthorized*

The court imposed a crime prevention fine of $10, plus a penalty assessment and a 20 percent surcharge. (§§ 1202.5, subd. (a), 1464, subd. (a)(1), 1465.7, subd. (a).) Appellant contends this was error because such a fine is imposed when a defendant is convicted of burglary, and he was not convicted of that offense. (§ 1202.5, subd. (a).) The court also imposed a $200 parole revocation fine, even though it sentenced him to life without possibility of parole. (§ 1202.45, subd. (a).) Appellant contends this fine was also unauthorized. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 ["When there is no parole eligibility, the [parole revocation] fine is clearly not applicable."].) Respondent concedes both fines were unauthorized. We agree with appellant and order the fines stricken.

### DISPOSITION

The trial court is directed to prepare an amended abstract of judgment striking the $200 parole revocation fine under section 1202.45 and the $31 crime prevention fine (with related penalty and surcharge) under section 1202.5. The court shall forward a copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

FLIER, J.

WE CONCUR:

RUBIN, Acting P. J.

GRIMES, J.