Filed 3/20/14  P. v. Sinegal CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ADAM JOHN SINEGAL,<br><br>Defendant and Appellant. | F066131<br><br>(Merced Super. Ct. No. CRM018095)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Kathleen M. Scheidel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# BACKGROUND

Defendant was charged with murdering Robert Lee Smith (count I – Pen. Code,[1] § 187, subd. (a)), assaulting Isaiah Lowery with a deadly weapon (count II - § 245, subd. (a)(1)), and assaulting Ada Lowery with a deadly weapon (count III - § 245, subd. (a)(1)). The information alleged that during the commission of the murder, defendant personally used a deadly weapon. (§ 12022, subd. (b)(1).) The prosecution dismissed count II for lack of evidence. Thereafter, count III was referred to as count II.

A jury found defendant guilty of murder as charged and found the deadly weapon allegation true. On count II (originally charged as count III), the jury convicted defendant of the lesser included offense of exhibiting a deadly weapon. (§ 417, subd. (a)(1).)

The court sentenced defendant to a prison term of 25 years to life on count I, with the possibility of parole. The court sentenced defendant to one year on the deadly weapon enhancement. Finally, the court sentenced defendant to a term of 12 months for the exhibiting a deadly weapon conviction. The court stated that the 12-month term on count II would be served first, and the sentence on count I would run consecutively thereafter.

Defendant appeals from the judgment, which we affirm in its entirety.

# TRIAL EVIDENCE

The events relevant to this case largely occurred at a three bedroom home in Gustine, California (the "home"). Many people lived in the home, including Leonia Lowery and her husband, Robert Smith ("Smith"). Leonia's daughter, Javeena, lived in the garage with defendant, her then-boyfriend. Javeena and defendant had at least three children together: L., H. and A. One of defendant's children, Z., had been adopted by

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

Smith and Leonia.[2]  Javeena had additional children living in the home including Ada, Jaleel[3], and Isaiah.

### Ada's Testimony

Ada testified that on June 7, 2011, at approximately 7:30 p.m. she was in the living room of the home.  Ada was in her room and she heard an argument between Smith and Javeena.  Ada went in to the living room. LaShonda and four or five of the "little kids"[4] were there, along with Javeena and Smith.  Ada was uncertain of the precise nature of Javeena's and Smith's argument.  She testified:  "I guess one of [the kids] fell or something or one of them hit each other, and someone said, 'No, hit him back.'  That's what the argument was over."  During the argument, Javeena was standing far enough away from Smith such that he could not have touched her.

Ada calmed her mother down while Smith went "about his business."  Smith was going to leave, but before he could do so, defendant walked up the stairs from the "back room" he shared with Javeena.  Defendant said Smith's name.  Smith replied, " '[W]hat?' "  Defendant then began stabbing Smith.  When defendant and Smith separated, Ada saw a knife in defendant's hand.

Ada approached Smith to "make sure he was okay."  She realized that Smith "wasn't making it."  Defendant "calmly" walked back down to his room.  Ada approached defendant and "tried to fight" him.  Defendant "came after" Ada "like he was going to stab" her.  Ada jumped out of the way and threw a can of "spray" at him.  Ada's brother, Isaiah, then tried to gain control of defendant.

---

[2] The testimony only explicitly shows that defendant was Z.'s father.  The context of the testimony also strongly suggests that Javeena was Z.'s mother.  And on appeal, both parties state that Z. was Javeena's son.  However, when asked how many children Javeena shared with defendant, she said "three" and named only L., H. and A.

[3] In various portions of the reporter's transcript, Jaleel's name is spelled "Jalel" or "Jaleel."

[4] All of the children were under age five.

Defendant went outside. Ada told defendant: " 'You MFer. You killed my grandfather.' " Defendant, with a knife in his hands, replied, " 'No, I didn't.' " Then, the police arrived.

**Javeena's Testimony**

Javeena testified that she argued with Smith "off and on all the time." The arguments were never violent and never involved weapons.[5]

Javeena said the argument with Smith involved Z. and H. H. had hit Z., so Smith told Z. to hit H. back. Javeena said, " 'No. They not [*sic*] going to fight.' " The argument continued in the living room for "about" 30 minutes. Javeena testified that the argument was more intense than normal arguments. But, she was not jumping up and down during the argument, nor did she throw anything at Smith. Javeena and Smith pointed fingers at each other during the argument, but they never touched one another.

Smith called for Ada to get Javeena and take her to her room. Ada asked if Javeena would go to her room, and Javeena refused. Smith yelled out defendant's name and asked him to come upstairs.

Javeena did not notice defendant coming up to the living room. After the argument "slowed down," Javeena bent down to pick up her four-month-old baby "or something." Then Javeena heard a loud commotion. She heard someone yell, " 'Stop. Stop. You're killing my grandfather.' " Javeena then saw blood on the face of her three-year-old son, H. Javeena looked up and saw Isaiah holding defendant's waist and arm. She rushed H. downstairs to wipe off the blood. She then ran across the street to the laundromat to tell her mother, Leonia, what had happened. Javeena then ran back to the

---

[5] Javeena's mother, Leonia, testified that Javeena and Smith argued constantly. The arguments were always verbal and never involved any physical contact. Leonia was never concerned that Smith would be violent towards Javeena. Conversely, Ada testified that Javeena and Smith did not argue "that often." When they did argue, it was never violent.

home.  When she returned, she asked defendant:  " '[W]hy did you do it?' "  He said, "Because I thought y'all was fighting."

### Isaiah's Testimony

Isaiah testified that Javeena and Smith argued frequently.  The arguments were always verbal, never physical.

Isaiah testified that he was in his room and heard arguing the day of the stabbing. He shut the door because the NBA finals were being televised.  Isaiah could not tell who was arguing.  Eventually, Isaiah heard screaming and came out of his room.  He saw Smith lying on the couch, bleeding.  Defendant was "over" Smith with a knife in his hand.  Isaiah "instantly" restrained defendant.  Defendant "jerked back" and cut Isaiah on the wrist.  Isaiah held on to defendant and began to push him towards the back of the house.  Defendant was still holding the knife when he started to "go after" Ada. Defendant looked "angry, upset or something" when he approached Ada.  Isaiah pinned his body against defendant and "got him downstairs."  The police arrived thereafter.

### Officer Rossiter's Testimony

Officer Michael Rossiter arrived at the scene shortly after 7:43 p.m. that night. When he arrived, there was "a whole lot of yelling … children crying and a lot of moving…."  While still outside the home, Officer Rossiter's attention was drawn to Jaleel because he was the most upset.  He told Jaleel to turn around and put his hands behind his back.  Jaleel and Isaiah told him that Jaleel had not done anything.  Defendant said "something to the effect of, 'Let him go.  I'm the one who just stabbed him.' " Officer Rossiter did not see the knife at the time, but later learned that defendant had it folded in his left hand.  Officer Rossiter told his partner to detain defendant.

Officer Rossiter entered the house and observed Smith lying facedown on the couch.  Officer Rossiter attempted to help Smith to breathe before the ambulance arrived.

5.

Officer Rossiter spoke with Isaiah and noticed a cut on his wrist. Isaiah told Officer Rossiter that defendant believed Smith was going to "put his hands on" Javeena. But Isaiah testified that he was speculating when he said that to Officer Rossiter.

Officer Rossiter also spoke with Javeena, who told him that defendant must have thought they were fighting. She also told Officer Rossiter that Smith had put his open hand up, the universal sign for stop.

Officer Rossiter's report did not reflect any witness saying that defendant said, "Robert" when he walked into the room.

**Forensic Pathologist's Testimony**

A forensic pathologist testified that Smith had suffered six stab wounds and bled to death. Smith had obvious stab wounds to the head and upper torso. Smith's right jugular vein had been cut, as had a portion of his lung.

**Defendant's Testimony**

Defendant testified that Javeena and Smith would argue about "many" things including money and children. He also testified that he had heart surgery in September 2010 that left him weak. He never fully recovered from the procedure.

From defendant's room, one could see half of the living room and the kitchen. Defendant testified that he was in his room eating and watching professional basketball on television. He heard H. crying upstairs. Javeena came down and asked if defendant would go upstairs and get H. Defendant went upstairs and retrieved H. He heard Smith "fussing at [Z.]" about H. Defendant "just looked at" Smith and smiled. Defendant then took H. downstairs. He heard screaming and arguing from the living room. Javeena came downstairs, upset. She told defendant that she was not going to let Smith "do this to my children." Defendant asked if Javeena wanted him to speak with Smith. Javeena declined and said she would "deal" with it. Javeena went back upstairs.

Defendant heard more arguing, but then "it got very quiet." He heard "foot scuffling," so he looked down the hallway. He saw Smith in the living room repeatedly

6.

"moving his right arm up and down." Defendant could not see Smith's hands. He thought Smith was hitting Javeena and was concerned Smith had a weapon. Defendant thought Javeena's life was in danger. Defendant "just want[ed] to go up there and … stop him."

Defendant could not tackle Smith because of his condition after heart surgery. Defendant kept a knife in the drawers of a dresser. He had to move or navigate around his bike and H.'s bike to get to the drawer.[6] He retrieved the knife and proceeded upstairs. He saw Smith "still in that kind of … up and down" motion. Defendant then started stabbing Smith. Defendant did not intend to kill Smith, "just to stop him." Once Smith fell, defendant looked around to see if he had a weapon.

Defendant walked away from the living room and felt something hit him in the back of his head. He turned around and saw Ada. By the time he turned around, he had already folded up the knife. Ada said, " 'You took my grandfather out.' " Defendant said, " 'Well, you hit me in the back of the head.' " He "took one step," and Isaiah "came from out of nowhere" and stepped in front of defendant. Isaiah said, " 'You already stabbed the man.' " Defendant said, " 'Okay. Isaiah, I'm going outside.' " As defendant turned around, he told Isaiah he thought Smith was trying to hurt Javeena. Defendant went outside and waited for the police to arrive.

Ada approached defendant outside and repeated, " 'You took my grandfather out.' " She told defendant, " 'You can't stay here so you better run.' " Defendant replied, " 'No. I'm going to wait here and wait for the police officers.' " Jaleel approached defendant and said, " 'Well, you think you're a man now?' " Defendant replied, " 'Well, I am, Jaleel.' " Javeena asked defendant why he did it, and defendant replied, " 'I thought he was hurting you. I thought he was hitting you, Javeena.' " She

---

[6] Defendant testified he had to "go … through" the bikes, indicating he either navigated around them or moved them.

replied, " 'I know you felt that way.' " She also told defendant: " 'Well, you know you [*sic*] going to jail?' " Defendant replied, " 'Yes.' "

The police arrived and detained Jaleel. Defendant said, " 'Officer, it's not him. Stop. I'm the one who did this.' "

That night, the police interviewed defendant. When the officers asked why he stabbed Smith, defendant told them he thought Smith was trying to hurt Javeena. Defendant tried to demonstrate the arm movement but was handcuffed. Defendant denied telling law enforcement that he had "snapped" or that "enough was enough."

**Prosecution's Rebuttal Evidence**

In rebuttal, the prosecution played the tape of defendant's postincident interview. During the interview, defendant said: "I let things go and I guess I snapped, you know. Because it seemed like he was hitting her, being, you know, and that's what I remember." He also said, "I guess enough is enough 'cause this has been going on between me and him about these boys for like what … well over a year. Almost two years." Later, defendant stated: "I lost it because I felt, like I said, the reason I lost it … I believe I lost it … because I thought he was attacking my lady." At one point, the following exchange between Officer Nelson and defendant occurred:

> "NELSON:    But I think the bottom line is … you just had enough. You were over it. You were over all the bulls**t that's been going on, and it's ok. If that's the case, that's the case, Adam.

> "[DEFENDANT]:    …that too, I had enough of that. In my view it appeared that's what he was doing."

DISCUSSION

## I. THE COURT DID NOT ERR IN FAILING TO INSTRUCT ON PROVOCATION/HEAT OF PASSION

### A. Duty to Instruct on Lesser Included Offenses

"On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.' [Citation.]" (*People v. Souza* (2012) 54 Cal.4th 90, 116.)

Voluntary manslaughter arising from a killing during heat of passion "is not a defense but a crime; more precisely, it is a lesser included offense included in the crime of murder." (*People v. Barton* (1995) 12 Cal.4th 186, 200-201.) "The trial court must instruct on lesser included offenses when there is substantial evidence to support the instruction, regardless of the theories proffered by the parties…." (*Id.* at p. 203.) "[E]ven absent a request … the trial court must instruct on a lesser included offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. [Citations.]" (*People v. Birks* (1998) 19 Cal.4th 108, 118.) "The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155.) "The duty extends to every lesser included offense supported by substantial evidence; it is *not* satisfied 'when the court instructs [solely] on the theory of that offense most consistent with the evidence and the line of defense pursued at trial.' [Citations.]" (*People v. Anderson* (2006) 141 Cal.App.4th 430, 442, original italics.) The rule requires sua sponte instruction on heat of passion "regardless of … the relative *strength* of the evidence on alternate offenses or theories …." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 160, original italics.)

" ' " 'The fact that the evidence may not be of a character to inspire belief does not authorize refusal of an instruction based thereon.' " ' [Citations.]" (*People v. Springfield* (1993) 13 Cal.App.4th 1674, 1680. See also *People v. Mayberry* (1975) 15 Cal.3d 143,

9.

151.)  In determining whether evidence is substantial, courts do not weigh the credibility of the witnesses.  (See *People v. Springfield*, *supra*, 13 Cal.App.4th at p. 1680.)  Doubts as to the sufficiency of evidence to warrant instructions should be resolved in favor of the defendant.  (*People v. Flannel* (1979) 25 Cal.3d 668, 685, superseded by statute in part as noted in *In re Christian S.* (1994) 7 Cal.4th 768, 777.)

The court has no duty to instruct on lesser included offenses unless there is substantial evidence that the lesser offense, but not the greater, was committed.  (*People v. Avila* (2009) 46 Cal.4th 680, 705.)  As explained below, we conclude that there was not substantial evidence to support a lesser included instruction.

## B.  Heat of Passion

Heat of passion includes two components: subjective and objective.  The subjective component of heat of passion voluntary manslaughter requires that the defendant killed while under the actual influence of a strong passion induced by the provocation.  (*People v. Moye* (2009) 47 Cal.4th 537, 550.)

### 1.  Subjective Component of Heat of Passion

The night of the stabbing, defendant told officers:  "And I heard like a scuffle upstairs, you know.  And I seen [*sic*] … when I came up and looked I seen [*sic*] like he had swung at her, you know.  I let things to and I guess I snapped, you know.  Because it seemed like he was hitting her .…"  Later, defendant said, "I lost it because I felt, like I said, the reason I lost it … I believe I lost it … because I thought he was attacking my lady."  These statements constitute substantial evidence that defendant killed while under the actual influence of a strong passion.

The Attorney General discounts these postarrest statements because defendant denied their substance at trial.  It is correct that, at trial, defendant denied that he had "snapped" or that "enough was enough."  But this testimony does not negate the duty to instruct on the lesser included offense.  "[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the

10.

defense itself." (*People v. Breverman*, *supra*, 19 Cal.4th at pp. 162-163, fn. omitted.) Here, a reasonable jury could have credited defendant's statement to police over his trial testimony.

The Attorney General argues appellant's explanations merely show he was "upset" or "scared" but not "angry." But this contention ignores the fact that the necessary passion for voluntary manslaughter "need not be anger or rage, but can be any ' " '[v]iolent, insense, high-wrought or enthusiastic emotion' " ' [citations]." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163.)

In sum, defendant's statements that he "lost it" and "snapped" because he believed Smith was striking Javeena constituted substantial evidence of the subjective component of heat of passion. Our next inquiry is whether the "provocation" was legally sufficient. That is, whether there was substantial evidence of the objective component of heat of passion.

### 2. Objective Component of Heat of Passion

The objective component of heat of passion voluntary manslaughter requires "sufficient provocation." (See *People v. Moye*, *supra*, 47 Cal.4th at p. 549.) "The provocative conduct … may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*Id*. at p. 550.) Importantly, the provocation need *not* "be of a kind that would cause an ordinary person of average disposition to *kill*…." (*People v. Beltran* (2013) 56 Cal.4th 935, 938, original italics.) Rather, the question is whether the provocation would induce a person of average disposition to react from passion rather than from judgment. (*Id.* at p. 939.)

Here, there was some evidence defendant believed Smith was hitting Javeena. And we acknowledge that seeing someone repeatedly strike the mother of your children may cause a person of average disposition to react from passion rather than judgment. However, there is another requirement that must be met for provocation to be legally

11.

sufficient. That is, provocation must either be (1) "caused by the victim" or (2) "conduct *reasonably* believed by the defendant to have been engaged in by the victim [citation]…." (*People v. Moye*, *supra*, 47 Cal.4th at pp. 549-550, italics added.) Here, there is no substantial evidence that defendant's belief Smith was hitting Javeena was reasonable.

Defendant simply saw Smith move his arm. Defendant interpreted Smith to have been moving his arm "as if" he was hitting someone. But defendant could only see a portion of Smith, and only a portion of his right arm. Defendant could not see Smith's hands at all. Defendant testified he had no idea what Smith was doing with his hand. As Smith's arm moved, defendant heard "no sound." Javeena was not screaming for help; the kids in the living room were not screaming, crying or running down the hallway. Defendant testified that he "wouldn't know" whether the argument had merely stopped and nothing else was occurring.

Therefore, we conclude that there was not substantial evidence of sufficient provocation. Specifically, there was no substantial evidence of provocation "caused by the victim" or "*reasonably* believed by the defendant to have been engaged in by the victim. [Citations.]" (*People v. Moye*, *supra*, 47 Cal.4th at pp. 549-550, italics added.) Therefore, the court did not err in failing to instruct on the lesser included offense of heat of passion voluntary manslaughter.

## II. SUBSTANTIAL EVIDENCE

Defendant contends there was insufficient evidence of premeditation and deliberation. We disagree.

### A. Standard of Review

"Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation …. Settled principles of appellate review require us to review the entire

12.

record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt.  [Citations.]  The standard of review is the same in cases such as this where the People rely primarily on circumstantial evidence.  [Citation.]  'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'  [Citation.]"  (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

Evidence need not be "overwhelming" to support a jury's finding of deliberation and premeditation.  (See *People v. Perez*, *supra*, 2 Cal.4th at p. 1127.)

A jury may reasonably consider a defendant's conduct after the killing to determine the "manner" of the killing.  (See *People v. Perez*, *supra*, 2 Cal.4th at p. 1128.)

### B.  Law of Premeditation and Deliberation

" 'The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.  The word "premeditated" means considered beforehand.' "  (*People v. Perez*, *supra*, 2 Cal.4th at p. 1123, quoting CALJIC 8.20.  See also *id*. at p. 1124 [proper standard of review involves considering evidence against definition of premeditation and deliberation "previously set forth"].)

"Premeditation and deliberation do not require an extended period of time, merely an opportunity for reflection.  [Citations.]"  (*People v. Cook* (2006) 39 Cal.4th 566, 603.)

### C. Analysis

Defendant points to the evidence of subjective heat of passion and argues it negates a finding of premeditation and deliberation. This contention relies on a misapplication of our standard of review. It is true that there was some evidence defendant subjectively acted in heat of passion. But that fact is not determinative on substantial evidence review. We are required to review the record "in the light most favorable to the judgment" to determine whether there was substantial evidence of premeditation and deliberation. (*People v. Perez*, *supra*, 2 Cal.4th at p. 1124.) All defendant's argument suggests is that some evidence " 'might also be reasonably reconciled with a contrary finding.' [Citation.]" Such a conclusion " 'does not warrant reversal of the judgment.' [Citation.]" (*Ibid*.)

Instead, we will apply the proper standard of review and consider the evidence in the light most favorable to the judgment. From the evidence presented at trial, the jury could have reasonably believed the following version of events:

Defendant had a longstanding disagreement with Smith about how defendant's children should be raised and treated.[7] Defendant "chose" to use a knife rather than tackling Smith due to defendant's condition after heart surgery. It took "quite a bit of time" for defendant to get to the dresser. Defendant opened the knife when he retrieved it

---

[7] The following excerpt from defendant's interview with law enforcement supports this conclusion:

> "[DEFENDANT]: I guess enough is enough 'cause this has been going on between me and [Smith] about these boys for like what … well over a year. Almost two years.

> "[DETECTIVE]: Wow, that's a long time.

> "[DEFENDANT]: I guess he threatened me enough, you know, so enough is enough. But, I ain't trying to you know. I don't know what kind of shape he's in."

from the drawer because that way he "wouldn't have to try and open it up when [he got] upstairs." At this point, defendant was preparing the knife for use as a stabbing weapon. Defendant walked towards Smith, and did not run. Defendant stabbed Smith several times in his head and upper torso. Defendant cut Smith's right jugular vein and a portion of his lung. Defendant then calmly walked back towards his room. Defendant had had "enough" of all the "bulls**t" that had been going on with Smith.

This version of events, supported by substantial evidence, shows that defendant went through several decision points before the killing. He chose to stab, rather than tackle Smith. And, he prepared the knife for use as a stabbing weapon before ever leaving his room. The evidence is sufficient to conclude that defendant killed deliberately and with premeditation.

### III. SENTENCING

Defendant contends the court erred in imposing the 12-month and life imprisonment terms consecutively. He argues that section 669, subdivision (a) prohibits life sentences from running consecutively to misdemeanor sentences. We disagree.

Section 669, subdivision (a) provides:

> "(a) When a person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively. Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment for a felony conviction. Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as calculated pursuant to Section 3046 or pursuant to any other section of law that establishes a minimum period of confinement under the life sentence before eligibility for parole."

15.

Defendant draws our attention to the second sentence of the subdivision: "Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively … with any other term of imprisonment for a felony conviction…." (§ 669, subd. (a).) Defendant argues that this sentence prohibits imposing a life term to run consecutive to a misdemeanor term. To the contrary, this sentence does not concern misdemeanor terms at all. Thus, while it does not expressly permit consecutive misdemeanor/life sentences, neither does it permit *concurrent* misdemeanor/life sentences. Alone, the sentence provides no answer to the question before us.

Conversely, the very next sentence of the statute begins, "Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to *any* determinate term of imprisonment …." (§ 669, subd. (a), italics added.) This portion of the statute expressly envisions the possibility that a life sentence could be ordered to run consecutive to *any* determinate term of imprisonment, not just felony terms. (§ 669, subd. (a). See also § 17, subd. (b) [confinement in jail as punishment for a misdemeanor offense constitutes "imprisonment"].) We therefore conclude the court did not violate section 669, subdivision (a) in imposing consecutive sentences here.

## DISPOSITION

The judgment is affirmed.

_____

Poochigian, J.

WE CONCUR:


_____

Kane, Acting P.J.


_____

Franson, J.

16.