Filed 12/29/23  P. v. Mancilla CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JAIRO MANCILLA,<br><br>　　　Defendant and Appellant. | F082925<br><br>(Super. Ct. No. F17902461)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Ivan P. Marrs, and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Jairo Mancilla was convicted of the first degree murders (Pen. Code,[1] § 187, subd. (a)) of Javier Lizaola, Jr. (count 1) and James Alexander Esquibel (count 2). As to each count, the jury found true a multiple-murder special circumstance (§ 190.2, subd. (a)(3)), an enhancement for the personal discharge of a firearm causing death (§ 12022.53, subd. (d)), and a gang enhancement (§ 186.22, subd. (b)(1)). On each count, the court sentenced defendant to a term of 25 years to life (see § 12022.53, subd. (d)), plus a consecutive term of life without the possibility of parole. The court stayed the gang enhancements under section 186.22, subdivision (b)(5) pursuant to California Rules of Court, rule 4.447.

On appeal, defendant contends (1) the trial court prejudicially erred by failing to instruct the jury on imperfect self-defense; (2) the gang enhancements must be reversed based on changes to the law made by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333); (3) the evidence was insufficient to support the jury's findings that the shootings were gang related under the version of section 186.22 in effect at the time of trial, as clarified by *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*); (4) he is entitled to a new trial on the substantive offenses separate from trial of the gang allegations pursuant to section 1109; and (5) the trial court erred by imposing a parole revocation fine.

In our original opinion, we accepted the People's concession that the gang enhancements required reversal pursuant to *Renteria*, *supra*, 13 Cal.5th 951, but otherwise affirmed the judgment. Relevant here, we held that the trial court erred in failing to instruct on imperfect self-defense, but the error was harmless under the *Watson*[2] test for harmless error.

---

[1] Undesignated statutory references are to the Penal Code.

[2] *People v. Watson* (1956) 46 Cal.2d 818, 836.

Defendant petitioned the California Supreme Court for review, arguing the error in failing to instruct on imperfect self-defense should be reviewed under the harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24. The state high court granted review (S281452), and ultimately transferred the matter to us with directions to vacate our opinion and reconsider the cause in light of *People v. Schuller* (2023) 15 Ca1.5th 237 (*Schuller*).

Pursuant to the California Supreme Court's order, we vacated our prior opinion. We now hold that the court's failure to instruct on imperfect self-defense was not harmless beyond a reasonable doubt. Accordingly, we must reverse defendant's convictions. We once again accept the People's concession that the findings on the gang enhancements must be vacated and retrial of the enhancements prohibited, inasmuch as there was not substantial evidence to support the enhancements under the standard articulated in *Renteria*, *supra*, 13 Cal.5th 951. In light of the foregoing, we need not, and do not, reach defendant's remaining claims of error.

## FACTS

### I.      The Shooting

After school on the afternoon of March 10, 2017, 17-year-old G.V.[3] was outside his house in Orange Cove, playing cards with his friend, 16-year-old R.M. After an hour or two, Anthony C., who G.V. knew as "Guero," stopped by.[4] G.V. and R.M. had known each other for six or seven years. G.V. had known Anthony for about two years. R.M. had never met Anthony before. The three remained at G.V.'s house for about 35 or 40 minutes.

---

[3] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[4] G.V. testified that "Guero" means "White."

3.

Eventually, Anthony suggested they take a walk to a nearby bike trail to "blaze it," meaning to smoke the marijuana he brought. It was just starting to get dark. The trio crossed a bridge and smoked as they walked on the bike trail. They first went to the right, but saw a woman and some children and turned around to avoid smoking in front of them. G.V. took two or three "hits" of marijuana but only felt the effects "[a] little." R.M. took one or two hits off the joint and did not feel the effects.

The trio stopped at a bench on the bicycle trail and sat for a while. At some point, they saw defendant approaching on the bike trail. Anthony walked over to defendant and spoke to him. It appeared to R.M. that Anthony and defendant knew each other. G.V. and R.M. had never met defendant before. Anthony returned to the bench with defendant and defendant shook hands with G.V. and R.M. Defendant was wearing white earphones and was talking on the phone. At some point, defendant asked R.M. where he was from, and R.M. said he lived in Dinuba.

Defendant was wearing black shorts, a black, short-sleeved shirt with white lettering, Nike shoes, and a straw hat like the type used for field work. G.V. testified the straw hat covered the top of defendant's face down to his nose. R.M. testified the hat came down to the middle of defendant's forehead. R.M. noticed defendant had a tattoo of a five-digit number above his left eyebrow that appeared to be a zip code beginning with the number nine. R.M. believed this to be the Orange Cove zip code. G.V. noticed that defendant had tattoos on his legs, including one that appeared to be a large "V" and another that appeared to be large vertical lines like another large letter. At trial, G.V. recognized a picture of defendant's legs, which had tattoos of the letters "V" and "L." Defendant also had tattoos on his arms but G.V. did not know what they were.

The four young men congregated around the bench and talked for approximately 30 minutes to an hour as it got darker. They did not smoke any more marijuana. Some light posts in the area were working, and some were not. Parts of the area near the bench were illuminated.

At some point, a woman rode by on a bicycle with a small trailer attached. She had one or two children with her, one of whom was riding a bike alongside her. Defendant yelled out to the woman, greeted her with a hug, and called her sister. She stopped to talk with defendant for about a minute. Defendant asked what she was doing out there and she responded that she was going to buy something. Defendant gave her a hug and told her to be careful. The woman and kids rode away.

At some point, Anthony said his brother was going to drop off food or money to buy food. Eventually, a car approached and Anthony spoke to the occupant for a minute or two.

When the vehicle left, the four men again gathered around the bench. G.V. testified that he was not high, and the effects of the marijuana were starting to go away. G.V. was sitting on the left side of the bench, and defendant was sitting on the right, while R.M. and Anthony were standing.

Two men appeared on the bike trail coming from the direction of a nearby liquor store. One of them was carrying a black bag. G.V. noticed the men when they were about 500 feet away and watched them approach. Defendant looked toward the men when they were about 300 feet away. When the two men were about 50 feet away, defendant leaned back and put his right hand near his waist. The two individuals passed in front of G.V.'s group. The two men were "going to pass by" and did not say anything. They made upward movements with their heads, as if to greet defendant and the group. G.V. did not perceive the movement as aggressive.

Defendant said to the two men, "What's up ese[?]" G.V. testified this phrase did not seem aggressive to him. However, he thought "ese" might have a different meaning "for them than for us." R.M. said he did not know whether it was aggressive and that defendant "just said what's up." The two men turned and walked toward defendant.

According to G.V., one of the two passersby said, "Shut up ho," and grabbed at something in his pants. G.V. said the person pretended like he was going to hit defendant but did not.

According to R.M., one of the two passersby said, "[W]hat bitch," or "[W]hat's up bitch," walked toward defendant, and pretended like he was going to hit defendant but did not. The other passerby said, "What's up dog[?]"

Defendant pulled something from his waistband, extended his arm in front of himself, and fired two shots at the men in quick succession.[5] The two individuals fell to the ground, and G.V. could see one of them bleeding. One of the victims, Javier Lizaola, Jr., died at the scene from a gunshot wound to the head. The other victim, James Alexander Esquibel, died at the scene from a gunshot wound to the chest.

Immediately after the shooting, G.V. ran home, and R.M. followed after him. R.M. looked back and saw defendant running. Defendant glanced at R.M. and G.V. as he ran by. It bothered R.M. that defendant was nearby because "he could have shot [them], too."

G.V. and his father discussed the incident. R.M. was scared to call the police because he did not want problems for being a snitch.

After the shooting, Anthony sent a text message to G.V. telling him not to say anything. Several days later, Anthony sent a text message to G.V., inviting him to go smoke marijuana. G.V. did not want to go because Anthony might want to make him "disappear." G.V. moved out of Orange Cove three or four days after the shooting.

At trial, both G.V. and R.M. identified defendant as the shooter. However, G.V. acknowledged that, at the preliminary hearing, he identified defendant as the shooter based on having seen his photograph on Facebook and not based on any independent

_____

[5] R.M. testified he told officers defendant had pulled out a gun, but at trial, he claimed he did not actually see a firearm. G.V. saw flames in front of defendant as he fired.

6.

memory of defendant having committed the shooting. On redirect, G.V. explained that, when he saw defendant at trial, he "had a memory of the day that it happened and of the pictures that [he] saw."

## II.  The Investigation

Law enforcement was dispatched to the scene of the shooting at approximately 8:07 p.m. that night. They found the victims lying on the ground dead near the bench. There were two white plastic bags near the victims, one containing a three-pack of beer and the other containing a three-pack of beer with one of the cans missing. There was also an open and empty beer can underneath one of the victim's legs. The light post near the bench and the victims was not working. No shell casings were found at the scene. No fingerprints were recovered at the crime scene.

Two bicycles were found within the crime scene area. One of the bicycles was connected to a child trailer and was found just off the bike path, north of the bench where the shooting occurred. Inside the trailer was an EBT card with the name of Valeria Mancilla. Officers determined Valeria Mancilla is defendant's sister. A woman who identified herself as Valerie Fernandez contacted officers sometime after the shooting about a bicycle that was within the crime scene area.

On the night of the shooting, at about 10:04 p.m., Fresno County Sheriff's Deputy V. Alonzo was on patrol in Squaw Valley when he saw a vehicle stopped on the side of the road with someone crouched near the right rear passenger side. Alonzo pulled over and approached the individual, who he identified at trial as defendant. Defendant seemed nervous and spoke with a stutter. Alonzo searched the vehicle and found bolt cutters, a flashlight, gloves, and a tactical vest. He found nothing to justify an arrest of defendant. He observed the right rear passenger tire to be flat and offered to help defendant fix it, but defendant refused. Alonzo left without arresting defendant.

A criminalist with the Fresno County Sheriff's Office analyzed the bullets recovered in Lizaola's and Esquibel's autopsies and opined that they were fired from the same gun.

Defendant was arrested on April 21, 2017, and was photographed at that time. Above his left eyebrow was a tattoo of "93646," the Orange Cove zip code. He had tattoos of the letter "F" on the back of his left forearm, the letter "C" on his right forearm, the letter "B" on his right upper forearm near the elbow, the letter "P" on the left upper forearm near the elbow, the letter "V" on his right shin, and the letter "L" on his left shin. Appellant also had a tattoo of Marilyn Monroe covering most of the left side and top of his head.

## III. Interviews of G.V. and R.M.

On March 21, 2017, Fresno County Sheriff's Detectives J. Diaz and A. Maldonado interviewed G.V. as a potential witness. G.V. told Diaz that, on the day of the shooting, he, R.M., and "Guero" played cards and listened to music at his house. G.V. did not know Guero's real name. Diaz was later able to identify Guero as Anthony C.

G.V. reported to Diaz that, on the bike trail, the suspect called out to a woman riding a bicycle something to the effect of, "Hey, sister," and "It[']s me" (boldface omitted). The woman's bicycle had something like a trailer in the back and she was with a child who also was riding a bicycle. Regarding the confrontation preceding the shooting, G.V. reported that the suspect said, "What's up ese[?]" The younger of the two victims responded, "Shut up ho" (boldface omitted), and then pretended he was going to hit the suspect. The second individual said, "What's up dog[?]" (Boldface omitted.)

G.V. reported to Diaz that Anthony contacted him right after the shooting and told him not to say anything. Diaz could not recall whether G.V. said he spoke with Anthony or whether this was relayed by text message. G.V. reported that, on the Wednesday after the shooting, he received a call from Anthony asking him if he wanted to "blaze it." (Boldface omitted.)

8.

G.V. mentioned to Diaz that he had seen reference to the victims on Facebook, and he referenced them by their monikers, JJ and Big Navajo. He was unable to provide information that would enable the detectives to develop a suspect in the shooting.

Diaz and Maldonado interviewed R.M. on March 22, 2017. R.M. spoke quietly and sometimes had difficulty understanding the questions posed to him. Diaz showed R.M. a photograph of Anthony, and R.M. reported that he did not really know the person but thought his name was Tony. He thought that Tony was a Sureño gang member or mostly hung around with Sureños.

R.M. provided Diaz with information regarding the evening of the shooting that was similar to his trial testimony. Additionally, he reported to Diaz that Tony told him that the woman on the bicycle was the suspect's sister, and that the suspect also said, "There's my sister," and screamed out her name. (Boldface omitted.) However, R.M. could not recall the woman's name. He described the woman's bicycle as a long bike that had a trailer for kids. The woman was with one or two little kids.

Regarding the confrontation that preceded the shooting, R.M. said the suspect said to the victims, "What's up ese[?]" (Boldface omitted.) R.M. said one of the victims walked up pretending he was going to hit the suspect by making a jerking motion while leaning forward. The other victim said either "[W]hat's up dog" or "[W]hat's up Bulldog" to the suspect. (Boldface omitted.) R.M. saw the suspect reach across his abdomen with his right hand and begin to stand up. He pulled out a gun and shot each victim one time. R.M. specifically reported seeing the gun.

Diaz showed R.M. two photographs taken from law enforcement databases, and R.M. was able to identify the individuals portrayed in the photographs as the shooting victims. R.M. also provided a description of the shooter. R.M. told Diaz that the shooter was male, medium height with skinny build, with a mustache and facial hair on his chin. He stated the shooter had a tattoo of numbers above his left eyebrow, the first of which was nine, and that it was possibly the zip code for Orange Cove.

Diaz ran a search of Fresno County law enforcement contacts for individuals with a tattoo of the zip code for Orange Cove. The search returned a photograph of defendant. No one else matched the search criteria. Diaz showed R.M. a lineup of six photographs, and R.M. identified defendant as the shooter within about 30 seconds.

## IV. Gang Evidence

The following evidence was presented regarding defendant's membership in the Vatos Locos Sureños (VLS) subset of the Sureño criminal street gang.

### A. Defendant's Prior Law Enforcement Contacts

On June 5, 2009, at about 12:26 p.m., a sheriff's deputy contacted defendant in a consensual encounter near 11th Street and Railroad Avenue in Orange Cove. When asked if he was a gang member, defendant said he was "VLS." The deputy saw "OC" tattooed on defendant's right hand, and "[B]" and "P" on the backs of his triceps.[6] When asked what the "B" and "P" tattoos meant, the deputy testified, "Brown Pride which is Sure[ñ]o." The deputy further testified that "OC just depicts the area that you're in."

On January 7, 2010, an Orange Cove police officer served defendant with a gang injunction.

On March 16, 2012, at around 5:13 p.m., an Orange Cove police officer contacted defendant near Adams Avenue and 12th Street. The officer observed a new, though unfinished, tattoo of the number 13 on defendant's right inner forearm. Defendant admitted he was a Sureño gang member.

On July 15, 2012, at around 10:21 p.m., an Orange Cove police officer contacted defendant at the intersection of Anchor and Adams Avenues. Defendant was wearing a

---

[6] The reporter's transcript says "V" and "P," but the deputy then testified that it stood for "Brown Pride." Also, the prosecutor's immediate follow up question was what meaning "the B and the P" had. (Boldface omitted.) Therefore, it seems clear this was a transcription error, and that the deputy testified the tattoos were "B" and "P."

blue shirt, white shorts, and blue tennis shoes. Defendant admitted he was a Sureño gang member. When asked how long he had been a Sureño, defendant said, "For a while."

On February 28, 2013, at around 3:40 p.m., the same Orange Cove police officer contacted defendant and Brian Santos in front of a residence on the 600 block of Anchor Avenue. Defendant was wearing blue jeans and a blue and white striped polo shirt. Defendant admitted he was a Sureño gang member. Defendant also said he knew Santos was a VLS Sureño gang member.

On April 13, 2013, at about 8:12 a.m., the same Orange Cove police officer observed three males – defendant, Abran Zavala and Brian Santos – inside a parked van at the same residence on the 600 block of Anchor Avenue. During the officer's prior contacts, there were "gang relations associated with" all three of the individuals and the VLS gang. Zavala and Santos admitted gang membership.

On August 19, 2013, a Fresno County Sherriff's deputy contacted defendant in the breezeway of the main courthouse. Defendant admitted he was a Sureño and lived in Orange Cove. He stated he had been a Sureño most of his life. He also said most of his friends and some family were Sureños.

On January 28, 2015, at around 4:56 p.m., an Orange Cove police officer was dispatched to a location in Orange Cove for a disturbance call involving four individuals fighting. Upon arriving at the location, the officer did not see anyone, but contacted an individual about two blocks away. That individual confirmed to officers that he was an active Bulldog gang member. The individual informed the officer that the people he had argued with were in a red truck, which was driving through the area. Officers conducted a traffic stop. The driver was Peter Gonzalez, and the passenger was defendant. The officer searched a law enforcement system and learned that defendant and Gonzalez had previously been served with a gang injunction that prohibited them from associating with known gang members within the city limits of Orange Cove. The officer asked defendant

11.

if he knew he was under the injunction, and he replied along the lines of, "Yes, I guess." Defendant and Gonzalez were cited for violating the injunction.

###    B.    Predicate Offenses

On May 17, 2012, at about 2:26 p.m., an Orange Cove police officer was dispatched to a burglary in progress. When he arrived at the address, he observed Adrian Cavazos in the dining room of the residence. A chase ensued, and Adrian[7] was eventually placed into custody. The officer observed that items were "thrown around" in the residence and a television had been removed from its wall mount or stand. Adrian was convicted of first degree residential burglary. Adrian is a self-admitted VLS Sureño gang member.

On May 14, 2013, at about 3:37 p.m., an Orange Cove police officer was dispatched to the intersection of Ninth Street and Park Boulevard for a report of shots fired. The officer found a gunshot victim at a school approximately five blocks away. The gunshot victim reported that he was driving when another vehicle pulled up beside him, and the driver of that vehicle fired shots at him. The gunshot victim reported that the shooter, Alejandro Moreno, had shot at him in previous incidents. Moreno pled to and was sentenced for violating section 245, subdivision (a)(2). Moreno was an active VLS Sureño gang member.

On October 26, 2013, at about 10:24 p.m., a California Highway Patrol officer conducted a traffic stop in Orange Cove on a vehicle being driven by Joseph Cavazos. The officer found a loaded handgun in the center console of the vehicle. Joseph was arrested for possessing the firearm and was prosecuted for violating section 29800. Joseph said he was an Orange Cove Sureño gang member.

---

[7] To avoid confusion with Joseph Cavazos, discussed below, we refer to these individuals by their first names.

12.

On June 16, 2014, at about 1:49 p.m., an Orange Cove police officer pursued a vehicle after it fled during a traffic stop initiated by other law enforcement personnel. The subject vehicle rammed the officer's vehicle twice. The driver of the vehicle was Juan Alberto Diaz. Diaz pled to and was sentenced for violating section 245, subdivision (c) and Vehicle Code section 2800.2. Diaz is a VLS gang member.

### C.  Prosecution's Gang Expert

Detective R. Swiney with the Fresno County Sheriff's Office testified as a gang expert for the prosecution. His primary area of expertise was Sureño and Bulldog criminal street gangs operating outside the City of Fresno. Swiney explained that the two gangs are rivals.

Swiney explained that a person can become a Sureño gang member by being "jumped in," that is, beaten for a certain amount of time, being "blessed in," that is, being allowed to join because of familial contacts, and by "putting in work," that is, committing crimes for the benefit of the gang. Those who hang around a gang member but are not members themselves may be known as associates.

Swiney explained that the Sureño gang has a hierarchical structure with members who are "in charge" being referred to as "shot callers." Some members are put in charge of gathering money (i.e., "taxes") on behalf of the gang. The gang makes money by committing burglaries and robberies, obtaining stolen property, and selling narcotics. Taxes are paid to the Mexican Mafia prison gang for protection of incarcerated Sureños.

Members of the Sureño gang care about the reputation of their gang. Committing violent crimes, such as murder, attempted murder, and assault with deadly weapons, instills fear and intimidates rival gang members and citizens in the community. As a result, witnesses to gang crimes often do not cooperate with law enforcement, which allows the gang to continue committing crimes. Fear and respect also help promote the gang and protect the gang's territory.

13.

Gang members will intentionally disrespect members of rival gangs by using derogatory terms or committing crimes in their rivals' territory. They may also cross out their rival's gang graffiti and put down who it came from. "[H]itting someone up" (boldface omitted) means to ask someone what gang they are from, and can be seen as a sign of disrespect that would lead to a violent confrontation. A gang member disrespected by a rival could respond with anything from "a simple stare down" to an assault or even a murder.

VLS is a subset of the Sureño criminal street gang that claims the City of Orange Cove as its territory. In March 2017, VLS had between 50 and 70 members. VLS members will sometimes identify themselves as Orange Cove Sureños or Orange Cove Sur. Members identify with the color blue and often wear apparel of the Dallas Cowboys or Los Angeles Dodgers. Common tattoos for members include "VLS," "Orange Cove Sure[ñ]os," "Orange Cove Sur," the number 13, one dot and three dots, "Orange Cove" or "O" and "C," a zip code or area code from Orange Cove, and the letter "M." Members make hand signs denoting the numbers one and three, the letters O and C, and the letters V and L.

Swiney opined that VLS engaged in a pattern of criminal gang activity, with the gang's primary activities being murder, attempted murder, assaults with deadly weapons, shooting at inhabited dwellings or vehicles, robbery, burglary, possession of firearms and possession of controlled substances for sale. VLS gang members are "territorial." (Boldface omitted.) They will mark their territory with gang graffiti and defend it with violent crime including murder.

Varrio Orange Cove Rifa (VOCR)[8] is a subset of the Bulldog gang that also claims the City of Orange Cove as its territory. Bulldogs associate with the color red.

---

[8] The reporter's transcript at times says "BOCR" and "Barrio Orange Cove Rifa," but Swiney also testified to some of the tattoos found on the victims (see *post*, at p. 18). One such tattoo was described as "a tattoo on the right hand near the knuckles of VOCR"

VOCR members may have tattoos of dog paws, a picture of a Bulldog face, a dog collar, or other similar items. In March 2017, the Bulldog presence in Orange Cove was stronger than the Sureño presence. The rivalry between VOCR and VLS has resulted in attempted murders and assaults with deadly weapons. VLS members have tried to eliminate VOCR members to get them out of the area and expand VLS's territory.

Swiney opined that defendant is an active member of the VLS gang, meeting at least six gang criteria. Swiney pointed to the fact that defendant self-admitted VLS membership on multiple occasions, has gang-related tattoos and clothing, has been identified as a gang member by a reliable source, and has associated with documented gang members. Swiney found defendant's tattoos of "93646" above his left eyebrow and Marilyn Monroe on his head to be significant in a gang context. Marilyn Monroe's initials are a reference to the Mexican Mafia. Defendant's "F" and "C" tattoos stand for Fresno County and his "V" and "L" tattoos stand for Vatos Locos. Defendant's tattoos of "B" and "P" stand for Brown Pride which can be a representation of Sureño and/or VLS.

Swiney opined, based on the victims' tattoos, that they were members of the VOCR subset of the Bulldogs.

When given a hypothetical generally tracking the prosecution's evidence of the present crime, Swiney testified such a crime would have benefitted the gang by protecting the gang's reputation and respect. Such a crime would also instill fear and intimidate witnesses and victims, which reduces cooperation with law enforcement and prosecutions. All that makes it easier for the gang to commit crimes.

---

on Esquibel. In response to the question, "And, again, what does VOCR stand for[?]" (boldface omitted), Swiney replied, "Varrio Orange Cove Rifa Bulldog criminal street gang." Therefore, it seems clear these are transcription errors.

### D. Other Gang-related Testimony

R.M. testified that he thought Anthony was a possible Sureño gang member. He based this belief on Anthony's familiarity with defendant and his belief that Anthony had family members associated with the gang.

Detective Diaz testified, based on his experience, that the phrase "what's up ese" (boldface omitted) is an aggressive statement used when a Sureño gang member confronts a rival gang member, whether Norteño or Bulldog.

## V. Defense Case

Dr. P. English is a cognitive psychologist with a Ph.D. in psychology. He testified for the defense. English has published scholarly pieces on general perception and vision. When given a hypothetical involving four youths near a bench in a park-like area on an evening with a full moon and no cloud cover, English testified they might not accurately perceive events due to degraded lighting conditions and the presence of other people, which are distractions. Stress or trauma can also compromise a witness's perception.

English also opined that our memories are cobbled together from multiple sources, including other peoples' recollection. There is a potential for memory contamination if a witness conveys their account to law enforcement 11 or 12 days after the event because intervening discussion with others could impact memory.

English criticized a "hypothetical" (boldface omitted) photographic lineup in which only one individual had a unique tattoo above his left eyebrow.

## DISCUSSION

## I. Failure To Instruct on Imperfect Self-defense

Defendant argues the trial court prejudicially erred in failing to instruct the jury on the lesser offense of voluntary manslaughter based on imperfect self-defense. The People contend the evidence did not support instructing the jury on imperfect self-defense but,

regardless, any error was harmless. We conclude the court prejudicially erred in failing to instruct the jury on imperfect self-defense.

## A. Procedural Background

During a hearing on jury instructions, the court asked defense counsel to confirm that defendant was not requesting jury instructions on any lesser included offenses. Defense counsel responded, "That is correct because I don't think the state of the evidence would allow me to make that request." The court stated that it believed the evidence supported a verdict on first or second degree murder but not manslaughter. The prosecutor agreed, stating that the case was "an identity case," and that there was no issue regarding heat of passion or imperfect self-defense.

The court then confirmed that neither party had requested any self-defense instructions. The following colloquy between the court and defense counsel followed:

> "THE COURT: Is that a strategic decision on your part to not argue two different theories to the jurors?
>
> "[DEFENSE COUNSEL]: Yes. It is defense's argument also that it wasn't [defendant]. It was someone else. So it would—tactically, it would make no sense to argue but on the other hand it was a self-defense aspect.
>
> "THE COURT: And as the evidence stands there was a very slight suggestion that any type of self-defense may have been at issue. The two witnesses that were present during the event in question made reference to that the two victims individually made some sort of a lunging or forward motion toward the person seated at the bench. But certainly, we don't know how that person received that motion. And other than the statements by the witnesses that those two individuals were shot soon after such movement was made, there is no further evidence that the shooter had any type of a concern for his safety or the safety of the others with him. So the Court would not be giving any self-defense instructions. And again, the defense's position is that they are not asking for such as well."

## B. Applicable Law

" 'A trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the

lesser offense is substantial enough to merit consideration by the jury.' [Citation.] The obligation to give an instruction on lesser included offenses exists even when a defendant expressly objects to it." (*People v. Nieves* (2021) 11 Cal.5th 404, 463.)

Voluntary manslaughter arising from imperfect self-defense is a lesser included offense of murder. (See *People v. Steskal* (2021) 11 Cal.5th 332, 345.) " 'Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury.' " [Citation.] 'To satisfy the imminence requirement, "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." ' " (*Ibid.*)

On appeal, we look for whether there is substantial evidence in the record that would have supported the omitted instruction. (E.g., *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139.) We review the evidence in the light most favorable to the defendant. (*Ibid.*) Doubts about the sufficiency of the evidence to warrant the omitted instruction are resolved in favor of the defendant. (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 372.)

## C.   An Imperfect Self-defense Instruction Was Warranted

Sufficient evidence of imperfect self-defense was presented to merit the court giving the applicable instructions. Specifically, the evidence supported the following inferences. VLS and VOCR are rival gangs that both claim the City of Orange Cove as their territory. The rivalry between VOCR and the Sureños has resulted in attempted murders and assaults with deadly weapons. Defendant, a VLS gang member, observed two individuals approaching. The two individuals were members of the VOCR Bulldog gang with tattoos that included a red dog paw, and "O" and a "C," and "VOCR" for Varrio Orange Cove Rifa Bulldog. From defendant's long history with the VLS gang, he would have known about his own gang's violent rivalry with the VOCR.

Defendant said, "What's up ese[?]" to the individuals. The two VOCR members responded with something to the effect of "Shut up ho," or "[W]hat's up bitch," and "What's up dog[?]" One of the two VOCR gang members walked toward defendant, and pretended like he was going to hit defendant but ultimately did not. One of the VOCR gang members made a threatening gesture moving his hand toward his waist like he was going to retrieve something from his pocket but did not ultimately produce a weapon. Defendant then shot the two VOCR gang members.

Given the context of gang rivalry, the verbal statements of the VOCR gang members and their physical movements, there was sufficient evidence to conclude defendant acted in the actual but unreasonable belief that he was in imminent danger of death or great bodily injury. Accordingly, there was sufficient evidence to submit the issue of imperfect self-defense to the jury.

The People point to defendant's use of the "derogatory" phrase "what's up ese" as evidence that he did not believe he was in imminent danger. But the evidence was in conflict on whether that phrase was derogatory or aggressive. While Detective Diaz testified that "[t]ypically" it is used by a Sureño confronting a rival gang member, G.V. said the phrase was not aggressive.[9] Instruction is required on all lesser included offenses supported by the evidence *regardless* of the relative strength of the evidence on alternate offenses. (*People v. Breverman* (1998) 19 Cal.4th 142, 160 (*Breverman*), disapproved on another ground by *Schuller*, *supra*, 15 Cal.5th at p. 260, fn. 7.) The question is not which theory of the offense is *most* consistent with the evidence but rather whether the uninstructed theory was supported by evidence sufficient to merit consideration by the jury. (See *People v. Anderson* (2006) 141 Cal.App.4th 430, 443 (*Anderson*).) We determine only the "bare legal sufficiency" of the evidence, "not its

---

[9] When asked if he thought it was aggressive, R.M. said, "I don't know. He just said what's up."

19.

weight." (*Breverman*, at p. 177.)  Because there was evidence the phrase was not aggressive, it is immaterial that there was other, perhaps even stronger, evidence the phrase was aggressive.[10]

In making these observations, we do not deny the contrary evidence indicating that defendant may well have intended to murder the victims before their verbal interaction. (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179.)  Rather we "hold only that it was for the jury, not the judge, to infer what [defendant] believed" with respect to imperfect self-defense.  (*Ibid.*)  In other words, the fact that the People have formulated a coherent view of the evidence consistent with the offense for which the jury was instructed does not mean it was unnecessary to instruct the jury on lesser included offenses supported by other evidence or inferences.  (See *Breverman*, *supra*, 19 Cal.4th at p. 160; *Anderson*, *supra*, 141 Cal.App.4th at p. 443; see also *People v. Vasquez*, at p. 1179 & fn. 2.)

The People argue that the reactions of Esquibel and Lizaola were "legally justified responses" to defendant's "verbal challenge."  The People rely on *People v. Enraca* (2012) 53 Cal.4th 735 for the proposition that imperfect self-defense cannot be invoked " ' " 'by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.' " ' " (*Id.* at p. 761.)  However, on the present standard of review, it is not dispositive that the People's view of the evidence is plausible or even persuasive.  What matters is that there was substantial evidence supporting the *uninstructed* theory (i.e., that "[w]hat's up ese" is not aggressive).  (See *Breverman*, *supra*, 19 Cal.4th at p. 160; *Anderson*, *supra*, 141 Cal.App.4th at pp. 442–

_____

[10] Moreover, accepting that the phrase was "aggressive" does not preclude imperfect self-defense.  One reasonable inference from the evidence is that defendant could have been fearful of imminent harm and was trying to intimidate the rival gang members as a means of self-defense.

443.)  "A defendant's right to instructions does not turn on the court's assessment of credibility or the strength of the evidence."[11]  (*People v. Cleaves*, *supra*, 229 Cal.App.3d at p. 371.)

The People next observe that defendant did not testify nor introduce any "direct" evidence of his mental state to justify imperfect self-defense.  However, even a defendant's subjective mental state does not need to be proven or supported with direct evidence but instead may be shown by circumstantial evidence.  (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697.)  Indeed, this is common given that direct evidence of mental state is rarely available.  (*People v. Beeman* (1984) 35 Cal.3d 547, 558.)  Here, the circumstantial evidence supported the inference defendant was in actual fear due to the situation described above (e.g., defendant was approached by rival gang members with tattoos who made aggressive statements and gestures).

The People also point to the fact that defendant's theory at trial was that someone else shot the victims, which is inconsistent with defendant acting in imperfect self-defense.  But once there is sufficient evidence of a lesser-included-offense theory, a court must instruct on it even if " 'the alternate theory . . . is inconsistent with the defense elected by the defendant. . . .' "  (*People v. Eilers* (1991) 231 Cal.App.3d 288, 294.)

We next consider prejudice.

---

**11** Even if the standard of review permitted us to resolve this factual issue regarding the phrase "[w]hat's up ese," we doubt it is sufficient to trigger the doctrine relied upon by the People.  Whatever else can be said of the phrase, it is neither a physical attack nor the commission of the felony.  Even if other forms of conduct could suffice, it seems incongruous to argue that, in context, the phrase "[w]hat's up ese" would have justified a *perfect* self-defense response from Esquibel and Lizaola but, in the same context, the phrases "what's up bitch" or "[s]hut up ho" along with arguably threatening gestures do not even justify the jury's *consideration* of an *imperfect* self-defense response by defendant.  (See *People v. Vasquez*, *supra*, 136 Cal.App.4th at p. 1179 [doctrine defeating imperfect self-defense applies where the defendant's conduct would legally justify a self-defensive response by the victim].)

## D. The Error Was Prejudicial

We previously examined whether this error was harmless under the *Watson* test for harmless error. We concluded *Watson* review was dictated by our Supreme Court's prior holdings in *Breverman*, *supra*, 19 Cal.4th at pages 164–165 and *People v. Gonzalez* (2018) 5 Cal.5th 186, 195–196, 201. However, after we issued the prior opinion, our Supreme Court decided *Schuller*, *supra*, 15 Cal.5th 237, which holds that the *Chapman* test for harmless error applies to error in failing to instruct on imperfect self-defense. (*Id.* at p. 255.) With regard to instructional errors that " ' "misdescri[be] . . . the elements" ' of the charged offense," the *Chapman* test " 'is exacting' " and requires reversal unless we are persuaded that " ' " '[n]o reasonable jury' " would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence' " (*Schuller*, at p. 261.)

The People first argue that no reasonable jury would have found defendant acted in imperfect self-defense because he "initiated and instigated the deadly encounter with the victims" by stating, " 'What's up ese.' " The People contend that, in the context of the ongoing gang rivalry between defendant's gang and that of the victims, this statement constituted "a derogatory slur intended to disrespect and offend the victims" and to provoke them to deadly violence, to which defendant intended to respond with deadly violence. However, we have already observed that the evidence is in conflict on this point and the conflict in the evidence was sufficient to warrant an instruction on imperfect self-defense. *Schuller* provides dispositive guidance in this circumstance. Once we find sufficient evidence from which a reasonable jury could find in the defendant's favor on the question of imperfect self-defense, we may not go on to find that error harmless "simply because the evidence against imperfect self-defense was so overwhelming that no reasonable jury could have possibly found in [the defendant's] favor on that issue." (*Schuller*, *supra*, 15 Cal.5th at p. 263.) Thus, evidence that defendant initiated the encounter with the victims by stating, "What's up ese" does not

22.

establish that failure to give an instruction on imperfect self-defense did not contribute to the verdict.

The People also argue the jury's finding on the gang enhancement supports a conclusion that the failure to instruct on imperfect self-defense was harmless. According to the People, in finding the gang enhancement true, the jury was required to find that defendant "killed the two rival gang members in order to advance the VLS's continued takeover of Orange Cove territory." The People contend this finding that defendant committed the murders for the benefit of VLS establishes that no reasonable jury would have found he acted in imperfect self-defense.[12]

We disagree the jury's finding on the gang allegation establishes that no reasonable juror would have found in defendant's favor on the issue of imperfect self-defense, had the jury been properly instructed. Based on a hypothetical similar to the facts of the instant case, the People's gang expert testified that the murders would have benefitted defendant's gang by protecting the gang's reputation, earning it respect, and instilling fear in the community. The expert did not testify that defendant necessarily intended to benefit the gang in this manner, and, in any event, these benefits are not necessarily inconsistent with a theory of imperfect self-defense. For example, the expert testified that members of the Sureño gang, of which VLS is a subset, care about the reputation of their gang. The expert also testified that gang members will intentionally

---

[12] The jury was instructed that, to find the gang allegation true, it was required to find that defendant "committed the crime for the benefit of, at the direction of, or in association with a criminal street gang" and that he "intended to assist, further, or promote criminal conduct by gang members." The People do not argue the evidence supported a finding that defendant committed the murders at the direction of or in association with a criminal street gang. Furthermore, as we discuss *post*, the People have conceded that there was no evidence that defendant specifically intended to promote criminal conduct by other gang members. The People rely only on the jury's finding that the crimes were committed for the benefit of the gang. We therefore do not further discuss the other elements of the gang enhancement.

23.

disrespect one another by using derogatory terms. The expert further testified that a gang member disrespected by a rival could respond with an assault or murder. Thus, the jury could have found that defendant's shooting of two rival gang members, in response to their intentional disrespect, benefitted the gang, even if defendant acted in imperfect self-defense.

Based on the foregoing, we cannot conclude that the error in failing to instruct on imperfect self-defense was harmless beyond a reasonable doubt. Accordingly, defendant's convictions must be reversed.[13]

## II. The Gang Enhancements

Defendant raises two contentions with regard to the gang enhancements to each count. (§ 186.22, subd. (b).) First, he contends the gang enhancements must be reversed based on changes to the law made by Assembly Bill No. 333. Second, he contends insufficient evidence supports the gang enhancements under the version of section 186.22 in effect at trial, as clarified by our high court in *Renteria*, *supra*, 13 Cal.5th 951. We have already concluded defendant's murder convictions must be reversed. Thus, the gang enhancements must, in any event, be vacated. Nonetheless, we address defendant's arguments arising under *Renteria* to determine whether the gang allegations may be retried on remand.

At the time of defendant's trial in 2021, section 186.22, subdivision (b)(1) required proof that: (1) the defendant committed a felony for the benefit of, at the direction of, or in association with a criminal street gang and, (2) he did so with the intent to promote, further, or assist in criminal conduct by gang members. In *Renteria*, our Supreme Court clarified the showing required to meet these standards when the defendant acts alone. (See *Renteria*, *supra*, 13 Cal.5th at pp. 963–964 [explaining that "cases

---

[13] The reversal moots defendant's contention that the court's imposition of a parole revocation restitution fine was improper.

involving lone actors pose different problems"].) Specifically, "[i]n a case involving a gang member who has acted alone in the commission of a felony, there must be evidence connecting testimony about any general reputational advantage that might accrue to the gang because of its members' crimes to the defendant's commission of a crime on a particular occasion for the benefit of the gang, and with the specific intent to promote criminal activities by the gang's members." (*Id*. at p. 969.)

The People concede the evidence was insufficient to show defendant had knowledge of the criminal activities of the members of his gang, and no evidence was presented to suggest defendant specifically intended to promote criminal activities by the gang's members. The People therefore concede the evidence is insufficient to prove defendant had the specific intent to promote criminal activities by the gang's members, as required by *Renteria*. (*Renteria*, *supra*, 13 Cal.5th at p. 969.) We accept the People's concession on this point. Because *Renteria* requires reversal without permitting the People to retry the gang allegation, we need not, and therefore do not, address defendant's additional contention that the gang enhancements must be reversed under Assembly Bill No. 333's amendments to section 186.22, which would permit retrial.

## III.    Section 1109

Assembly Bill No. 333 also added section 1109, which requires bifurcation of the trial of gang enhancements from that of the underlying offenses upon a defendant's request. (§ 1109, subds. (a), (b).) Defendant contends section 1109 applies retroactively to him, and the court's failure to bifurcate entitles him to a new trial on the substantive offenses. The People argue section 1109 does not apply retroactively and, in any event, any error in failing to bifurcate the gang-related allegations was harmless.

In light of our reversal of the convictions, we do not address this argument. Section 1109 will apply in any proceedings on remand.

## **DISPOSITION**

The judgment is reversed and the matter remanded for further proceedings.


DETJEN, J.

WE CONCUR:


LEVY, Acting P. J.


POOCHIGIAN, J.